[No. S004755. Crim. No. 26000. Nov. 25, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS FRANCIS EDWARDS, Defendant and Appellant.

794

## COUNSEL

Lisa Short, Timothy J. Foley and Joseph Schlesinger, under appointments by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Jay M. Bloom and Louis R. Hanoian, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

ARABIAN, J.—In this case, arising out of the 1978 death penalty law, defendant was convicted of the first degree murder of Vanessa Iberri (Vanessa) and the attempted first degree murder of Kelly Cartier (Kelly). (Pen. Code §§ 187, 664.)[1] The jury found that defendant personally used a firearm during the commission of both offenses (§ 12022.5), and intentionally inflicted great bodily injury on Kelly. (§ 12022.7.) As to the murder count, the

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

jury found true the special circumstance that defendant intentionally killed the victim while lying in wait. (§ 190.2, subd. (a)(15).) The first penalty trial ended in a mistrial, as the jury was unable to reach a verdict.

After the second penalty trial, the jury imposed the death penalty. The trial court then granted a new penalty trial because of error under *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782], a case decided the same day as the penalty verdict. A third penalty trial ended with the jury again imposing the death penalty. This time, the court denied defendant's motion for a new trial. It also denied the automatic motion to modify the verdict (§ 190.4, subd. (e)), and entered a judgment of death. This appeal is automatic. (§ 1239.) We affirm.

## I. FACTS

### A. *Guilt Phase*

On Saturday, September 19, 1981, defendant, an excellent marksman, tragically shot 12-year-old Vanessa between the eyes and her 12-year-old friend, Kelly, in the head with a .22-caliber pistol while the girls were walking to a picnic lunch from a campsite in the Blue Jay campground in Orange County. Vanessa died of her wound; Kelly survived.

### 1. *Prosecution Evidence*

Defendant was an employee of the South Coast Gun Club in Santa Ana. He visited the Blue Jay campground "quite often, usually every weekend." He was seen at the gun club the morning of September 19. Around 11 a.m. that same morning, a truck that looked like defendant's red Datsun pickup entered the campground, which was about half full.

Kelly and Vanessa were spending the weekend camping at the same campground with Vanessa's mother and stepfather. Around 2 p.m., the girls left their campsite to have a picnic lunch at a site they had selected earlier that morning. As they were walking by a restroom near the entrance, Kelly saw defendant's truck drive slowly towards them. Defendant looked in their direction, and then drove past. The girls then walked out of the campground towards the picnic site.

Two other campers observed the girls leave the area. Two to three minutes later, one of the campers saw defendant drive his truck out of the campground. Shortly thereafter, while Kelly and Vanessa were walking down the road, with Vanessa in front, Kelly heard a car coming, and told Vanessa to

"get on the side of the road." They both moved over. Defendant drove alongside the girls, stopped, and said, "Girls." He then fired two shots from a pistol, the first at Vanessa, the second at Kelly.

Defendant hit Vanessa in the forehead, a quarter of an inch to the right of center, just above the eyebrows. He hit Kelly in the right side of the head. Kelly fell to the ground, but saw defendant get out of the truck and run to the back. She heard something slam in the back of the truck, then saw defendant return to the truck cab and drive away.

In the meantime, other campers, including the two who had seen the girls walk out of the campground, were driving in two trucks to get some firewood. As the front truck, driven by Larry Ellis, was going over a speed bump just outside their campsite, one of the passengers, Charles Vaughn, looked to his left across a meadow. Vaughn saw the top portion of defendant's parked truck. He saw defendant run from the front of the van to the back, and then back towards the front. Vaughn then lost sight of defendant, as some trees blocked his view. None of the group heard any gunshots.

Thinking defendant might have been a poacher, Vaughn told Ellis to drive in that direction. The second truck followed. When they came around a bend in the road, Vaughn and Ellis saw defendant standing near the front of his truck. Defendant looked towards the girls on the side of the road, then over his shoulder towards the Ellis truck. Defendant then jumped into his truck and drove away at high speed. Ellis gave chase while the driver of the second truck stopped to aid the stricken girls. Defendant got away after a high-speed chase, but not before Ellis and Vaughn got the license number of the truck. It was registered to defendant.

An extensive manhunt over the next few days failed to find defendant. He was eventually arrested in the State of Maryland on September 28, 1981. Bus tickets dated from September 24 to 27 with destinations from Los Angeles to Washington, D.C., were found in his motel room. Defendant's truck was later found near a bus station in Los Angeles. The camper portion of the truck contained several firearms and quantities of ammunition. Additional firearms belonging to defendant were found in a storage area of the South Coast Gun Club.

Vanessa died of a single gunshot wound to the forehead. Kelly received a grazing wound in the scalp. She required surgery to remove an accumulation of blood underneath the skull (an "epidural hematoma"), but eventually recovered.

Two .22-caliber casings were found at the scene of the shooting. Ballistics analysis established that none of the firearms found in defendant's truck or among his property at the gun club fired the fatal bullet.

A week or two before the shooting, Bobby Pamplin sold a .22-caliber Ruger handgun to defendant. It could have been the murder weapon, but was not found after the shooting. Pamplin testified that defendant was an "excellent shot." He observed defendant fire the Ruger at the firing range. Defendant "repeatedly" hit a target the size and shape of a chicken at a distance of 50 yards.

In January 1983, shortly before the guilt phase trial began, defendant told a deputy sheriff in the county jail that he was "guilty as sin."

During the guilt phase trial, the jury viewed the crime scene. The scene of the shooting was relatively isolated. It was approximately halfway between the Blue Jay campground and a neighboring campground. More than a quarter of a mile separated the spot where defendant passed the girls the first time and the spot where he shot them.

### 2. *Defense Evidence*

The defense did not dispute that defendant shot the two girls. It presented evidence suggesting that the shooting was not premeditated, but was a sudden act of violence caused by depression over defendant's recent divorce. Defendant did not testify.

### B. *Penalty Phase*

At the third penalty trial, the one currently under review, the prosecution presented essentially the same evidence concerning the crimes as at the guilt phase. It introduced no additional evidence.

The defense presented evidence concerning defendant's marital problems and their effects on him, his good character traits, his good behavior in jail, and his apparent remorse for the crimes. Defendant did not testify.

### II. DISCUSSION

### A. *Guilt Phase Issues*

### 1. *Denial of Change of Venue*

■ Defendant contends the trial court erred in denying his motion to change venue from Orange County.

■ The applicable law is settled. A change of venue must be granted when the defendant shows a reasonable likelihood that, in the absence of

such relief, a fair trial cannot be had. The court considers such factors as the nature and gravity of the offense, the size of the community, the status of the defendant, the popularity and prominence of the victim, and the nature and extent of the publicity. ■ On appeal after a judgment following the denial of a change of venue, the defendant must show both that the court erred in denying the change of venue motion, i.e., that at the time of the motion it was reasonably likely that a fair trial could not be had, and that the error was prejudicial, i.e., that it was reasonably likely that a fair trial was not in fact had. The trial court's essentially factual determinations as to these factors will be sustained if supported by substantial evidence. We independently review the trial court's ultimate determination of the reasonable likelihood of an unfair trial. (*People* v. *Cooper* (1991) 53 Cal.3d 771, 805-806 [281 Cal.Rptr. 90, 809 P.2d 865]; *People* v. *Bonin* (1988) 46 Cal.3d 659, 672-673, 676-677 [250 Cal.Rptr. 687, 758 P.2d 1217].)[2]

■ As the trial court recognized, the gravity of the offense is most serious and, if considered alone, would support a change of venue. Review of the other factors, however, compels the conclusion that a change of venue was properly denied.

At the time of the guilt trial in early 1983, Orange County was California's second largest county in population. (*People* v. *Cooper, supra,* 53 Cal.3d at p. 806, fn. 4.) Defendant claims Orange County is too "White," too "Republican," and too prosperous to afford a fair trial, but presents no credible supporting evidence. The size of the county weighed heavily against a change of venue. (*People* v. *Bonin, supra,* 46 Cal.3d at p. 677; *People* v. *Harris* (1981) 28 Cal.3d 935, 949 [171 Cal.Rptr. 679, 623 P.2d 240].)

Defendant was a resident of Orange County at the time of the crime. The media generally identified him as a resident of Costa Mesa employed at a gun club in Irvine. In contrast to *People* v. *Williams* (1989) 48 Cal.3d 1112, 1131 [259 Cal.Rptr. 473, 774 P.2d 146], where a change of venue was found necessary, defendant was not an outsider in either a "geographic or racial sense."

Although there was an understandable outpouring of sympathy for the victims immediately after the crime, they had no particular celebrity status in

[2]Defendant contends that reviewing the trial court's factual determinations under the deferential substantial-evidence standard (*People* v. *Bonin, supra,* 46 Cal.3d at pp. 676-677) violates the mandate of *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 382-383 [66 Cal.Rptr. 724, 438 P.2d 372], that we independently review the entire record to satisfy ourselves that the defendant received or will receive a fair trial. On the contrary, we review the entire record to assure ourselves that the court's specific factual findings are factually supported, and review the ultimate question de novo. As discussed in *Bonin,* this conforms to well-settled principles of appellate review. *Maine* requires no more.

the community. Indeed, they were not residents of Orange County at all, but residents of neighboring Riverside County who happened to be camping in Orange County. In contending that the victims' prominence supported a change of venue, defendant stresses "their particular status as children." This status, however, will not change with a change of venue. Prospective jurors would sympathize with the girls' fate whether trial were held in Santo Domingo in the Dominican Republic, Orange County, or any other county in California. The horrendous crime, not the locale of trial, evokes the sympathy.

Defendant stresses the substantial publicity of the crime. After reviewing the voluminous defense exhibits, the trial court found "that the news coverage was extensive, that there was some aspects of sensationalism, but that it was not overly sensational in the coverage and that the coverage appeared to be reasonably fair." Substantial evidence supports this finding. Media coverage of the crime was intense, especially soon after its commission and defendant's arrest. But such coverage was generally fair, and not inflammatory. It pales in comparison with the publicity we found insufficient to compel a change of venue in a serial murder case tried in Orange County. (*People* v. *Bonin, supra,* 46 Cal.3d at p. 677 [reports that the defendant was the "Freeway Killer," had a history of mental illness, had prior convictions, had been linked to as many as 44 killings, had admitted 21 killings, and had already been convicted of 10 murders in Los Angeles and sentenced to death].)

In addition, the court found that "time has diminished greatly the events that were before the public." The record also supports this finding. The motion to change venue was denied about 10 months after the crime. Trial began another six months later. Passage of time weighs heavily against a change of venue. (*People* v. *Bonin, supra,* 46 Cal.3d at pp. 677-678.) As Marcus Aurelius said some two millennia ago, "All is ephemeral—fame and the famous as well." (Meditations, IV, 35.)

Citing *Maine* v. *Superior Court, supra,* 68 Cal.2d at pages 386-387, defendant also contends that political factors supported a change of venue. There is some evidence in the record that the sheriff criticized the initial appearance of the public defender's office in this case. The sheriff later ran for reelection. But defendant's showing, consisting mainly of media reports, does not compel a change of venue. Indeed, defendant's own poll showed that most of the populace remembered nothing about any political controversy .

After completion of the individual jury voir dire, defendant renewed his motion for a change of venue. The court denied the motion, finding "that we

will be able to find twelve [jurors] that will have no influence whatsoever from anything they ever read about or heard about this case. It just wasn't a major problem in talking with them." Defendant does not specifically challenge this ruling. Our review of the record convinces us it was correct. Trial was properly held in Orange County.

### 2. Jury Selection Issues

#### a. Waiver of Defendant's Presence

At the outset of the guilt trial, defendant expressed the desire to be absent during jury selection. After being fully admonished of his right to be present, and with his attorney's approval, defendant personally waived the right both in writing and orally. The court accepted the waiver after finding defendant "knowingly and willingly" waived his rights. It informed defendant that if he changed his mind, he could come back into court at any time. Defendant then absented himself during jury selection. A week after the waiver, another hearing was held to determine whether defendant still wanted to be absent. He did. Defendant was present during the evidence portion of trial.

Defendant contends the right to be present during jury selection cannot be waived. In essence, he argues that a defendant who does not want to be present during jury selection can achieve his wish only if he engages in "disruptive behavior." A defendant who behaves himself but "merely desires to be absent" cannot, he claims, be accommodated. We disagree. This right, like other more fundamental rights (e.g., against self-incrimination, to testify, to have an attorney, to confront witnesses, and to have a jury trial at all), may be waived. A defendant need not be disruptive before a court may grant his request and excuse him from attending jury selection.

*People* v. *Robertson* (1989) 48 Cal.3d 18 [255 Cal.Rptr. 631, 767 P.2d 1109] is closely on point. In *Robertson*, the defendant filed a written waiver adapted from the form set out in section 977, subdivision (b)[3] waiving his right to be present at the sentence-modification hearing and imposition of sentence. As in this case, defendant argued that his presence at any "critical

---

[3]Section 977, subdivision (b), provides in pertinent part: "In all cases in which a felony is charged, the accused must be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he shall, with leave of court, execute in open court, a written waiver of his right to be personally present, approved by his counsel, which waiver must then be filed with the court; provided, however, that the court may specifically direct that defendant be personally present at any particular proceeding or portion thereof. The waiver shall be substantially in the following form: [the form follows]."

phase" of a capital trial may not be waived. Based in part on the "solicitude shown by modern jurisprudence to the defendant's prerogative to waive the most crucial of rights" (48 Cal.3d at p. 61), we disagreed, and held that a capital defendant may waive his right to be present even at critical stages of the proceeding. (*Id.* at pp. 59-62.) This holding applies equally to jury selection. It would be anomalous to force a defendant to misbehave before he could fulfill his wish to be absent from the proceedings.

Defendant argues that such a waiver should not be allowed in capital cases. However, as noted in *Robertson*, "Our statutes governing waiver make no distinction between capital and other felony defendants . . . ." (48 Cal.3d at pp. 61-62.) In *Robertson*, we cited sections 977 and 1193. The applicable statutes here are sections 977 and 1043. The latter generally provides that "the defendant in a felony case shall be personally present at the trial." (§ 1043, subd. (a).) Exceptions include when the defendant is disruptive (§ 1043, subd. (b)(1)) and "Any prosecution for an offense which is not punishable by death in which the defendant is voluntarily absent." (§ 1043, subd. (b)(2).) Section 1043, subdivision (d), also states, "Subdivisions (a) and (b) shall not limit the right of a defendant to waive his right to be present in accordance with Section 977."

In combination, sections 977 and 1043 provide that although mere voluntary absence is not sufficient in a capital case to hold the trial without the defendant's personal presence, such presence may be waived (at least as to those proceedings not specifically listed in section 977, subdivision (b)). Defendant argues that the legislative history of these sections discloses no intent to allow such waiver in capital cases. Nothing in that history, however, suffices to overcome the plain language of the statutes. ■ When statutory language is clear and unambiguous, there is no need for construction, and courts should not indulge in it. (*People* v. *Belleci* (1979) 24 Cal.3d 879, 884 [157 Cal.Rptr. 503, 598 P.2d 473].) We thus adhere to *Robertson, supra,* 48 Cal.3d 18. ■ A capital defendant may waive his right to be present even at critical stages of trial. (We do not here decide whether a defendant may waive his presence as to those proceedings specifically listed in section 977, subdivision (b); see *People* v. *Sully* (1991) 53 Cal.3d 1195, 1237-1240 [283 Cal.Rptr. 144, 812 P.2d 163].)

Defendant also argues the "public and state" have an independent interest in compelling him to be present during jury selection. The Legislature, however, has deemed otherwise. (Cf. *People* v. *Chadd* (1981) 28 Cal.3d 739, 745-755 [170 Cal.Rptr. 798, 621 P.2d 837] [upholding § 1018, which prohibits a capital defendant from pleading guilty without the consent of counsel]; and *People* v. *Stanworth* (1969) 71 Cal.2d 820, 833-834

[80 Cal.Rptr. 49, 457 P.2d 889] [applying the automatic appeal provisions of § 1239, subd. (b)].)

Defendant cites *People* v. *Deere* (1985) 41 Cal.3d 353, 362-368 [222 Cal.Rptr. 13, 710 P.2d 925] (*Deere I*), where we held that a defendant may not bar his attorney from presenting mitigating evidence at the penalty phase. Subsequent decisions, however, have "largely undermined" this holding. (*People* v. *Deere* (1991) 53 Cal.3d 705, 716 [280 Cal.Rptr. 424, 808 P.2d 1181] (*Deere II*); see *People* v. *Lang* (1989) 49 Cal.3d 991, 1030 [264 Cal.Rptr. 386, 782 P.2d 627]; *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1228, fn. 9 [259 Cal.Rptr. 669, 774 P.2d 698].) In any event, even *Deere I* allowed the defendant to completely waive a penalty phase jury. (41 Cal.3d at pp. 359-360.) A capital defendant who has "stated an intention to seek a death verdict" may waive his right to counsel. (*People* v. *Bloom, supra,* 48 Cal.3d at p. 1223.) Waiver of presence during jury selection "by no means ensure[s] the return of a death verdict." (*Ibid.*) Indeed, defendant, through counsel, vigorously defended himself at both the guilt and penalty phases.

██ Defendant also argues that even if he may legally waive his right to be present, he did not validly do so. Although the written waiver was substantially in the prescribed form, defendant argues it was not "execute[d] in open court" as required by section 977, subdivision (b). The form was apparently executed between two court sessions held the same day. It was filed at the latter session accompanied by a full oral waiver. This was sufficient compliance with the statute. (*People* v. *Robertson, supra,* 48 Cal.3d at p. 62.)

Defendant finally asserts he was "suicidally depressed." Nothing in the record, however, suggests defendant was unable to understand and waive his right to be present. Counsel concurred in the waiver. The court found it was knowing and voluntary. It is not irrational for a defendant represented by experienced counsel to not want to physically endure the lengthy jury selection process. Defendant validly waived his right to be present during jury selection.

b. *Public Trial*

To "minimize" potential prejudice to criminal defendants in capital cases, we held in *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301], "that portion of the voir dire of each prospective juror which deals with issues which involve death-qualifying the jury should be done individually and in sequestration." (Fn. omitted.) In compliance with this mandate each prospective juror at the first trial was questioned individually in one of the jury rooms, a room selected "so that everyone would be

able to spread out and so that the prospective jurors would feel more comfortable." It was "tacitly understood that the sequestered voir dire that would occur in the jury room . . . was not to be an open proceeding during which members of the press or public could simply wander in. . . . [M]embers of the press or public could not walk into the jury room any more than they would have been able to walk into chambers were the voir dire being held there."

Prior to the commencement of this individual questioning, a local television station requested permission to conduct "extended media coverage" of the duration of the trial with a "Standard portable videotape minicamera & recorder." Defendant objected. The court denied the request at least as to jury selection. The record reflects no other media request to be present during voir dire, and no specific request to report or observe the sequestered questioning in any fashion.

After the trial, the United States Supreme Court held in a "free press" case that jury voir dire should presumptively be conducted in open court, which presumption may be overcome only upon specified express findings by the court. (*Press-Enterprise Co.* v. *Superior Court of Cal.* (1984) 464 U.S. 501 [78 L.Ed.2d 629, 104 S.Ct. 819] (hereafter *Press-Enterprise*), discussed in *People* v. *Thompson* (1990) 50 Cal.3d 134, 156 [266 Cal.Rptr. 309, 785 P.2d 857]; see also *Ukiah Daily Journal* v. *Superior Court* (1985) 165 Cal.App.3d 788 [211 Cal.Rptr. 673] (hereafter *Ukiah Daily Journal*).) ▮▮▮ Defendant contends the *Press-Enterprise* rule was violated in this case. Although he *objected* to the request for extended media coverage, and never asserted any public trial right of his own, he further contends the violation requires his conviction be reversed. (Cf. *Waller* v. *Georgia* (1984) 467 U.S. 39 [81 L.Ed.2d 31, 104 S.Ct. 2210] [closing a suppression hearing to the public over defense objection requires a new suppression hearing].)

We considered a similar contention in *People* v. *Thompson, supra,* 50 Cal.3d 134. There, unlike both *Press-Enterprise* and *Ukiah Daily Journal,* "neither the media nor any representative of the public asked to witness the voir dire." (50 Cal.3d at p. 157.) Because of this, we were "concerned solely with the right of a defendant to a public trial," and found that defendant had waived that right by the failure to assert it in timely fashion. (*Ibid.,* fn. omitted.)

Defendant argues that here the press did request coverage of the voir dire proceedings. He relies on the television request for extended media coverage of the entire trial and on a newspaper request to cover the trial made *after* the sequestered voir dire was completed. The latter clearly was not a request to cover the earlier portions of trial. We need not decide whether the general

request for extended coverage of the entire trial was a sufficient request for normal coverage of the sequestered jury selection, for defendant's objection to the media request waived *his* right to complain of the court's ruling on appeal.

A defendant "may, by his own acts or acquiescence, waive *his right* [to a public trial] and thereby preclude any subsequent challenge by him of an order excluding the public. Unlike the jury trial right which requires an express personal waiver [citation], the constitutional guarantee of a public trial may be waived by acquiescence of the defendant in an order of exclusion." (5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2618, p. 3137, italics in original; see also *People* v. *Williams* (1988) 45 Cal.3d 1268, 1309 [248 Cal.Rptr. 834, 756 P.2d 221] [defense request for private *Hovey* voir dire waives right to public voir dire; no personal waiver necessary].)

This result is consistent with *Press-Enterprise, supra,* 464 U.S. 501, where the press won the right to cover voir dire, but the criminal conviction of Albert Greenwood Brown, the defendant in the underlying case, was not affected. (See *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].) Defendant is not entitled to the windfall of a reversal of his conviction because the court may have violated a public right to which he objected.

### 3. *Sufficiency of the Evidence of Premeditation*

Defendant contends there was insufficient evidence of premeditation and deliberation to support the verdict of first degree murder. "In reviewing the sufficiency of the evidence, we must draw all inferences in support of the verdict that can reasonably be deduced and must uphold the judgment if, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." (*People* v. *Miranda* (1987) 44 Cal.3d 57, 86 [241 Cal.Rptr. 594, 744 P.2d 1127].) The evidence of this case supports, even compels, a finding of premeditation.

Defendant relies on the familiar tripartite test set forth in *People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942], which requires us to focus upon evidence of (1) the defendant's *planning* activity prior to the killing; (2) his *motive* to kill, derived from his prior relationship or conduct with the victim; and (3) the *manner* of killing, indicating some preconceived design to kill in a certain way. Evidence of all three elements is not essential, however, to sustain a conviction. A reviewing

court will sustain a conviction where there exists evidence of all three elements, where there is "extremely strong" evidence of prior planning activity, or where there exists evidence of a motive to kill, coupled with evidence of either planning activity or a manner of killing which indicates a preconceived design to kill. (*People* v. *Hovey* (1988) 44 Cal.3d 543, 556 [244 Cal.Rptr. 121, 749 P.2d 776].)

Viewing the evidence most favorably to the prosecution, there was extremely strong evidence of planning, the most important of the *Anderson* factors. (*People* v. *Alcala* (1984) 36 Cal.3d 604, 627 [205 Cal.Rptr. 775, 685 P.2d 1126].) Defendant carried a loaded handgun in the cab of the truck. Before the shooting, defendant drove past the two girls as they were leaving the campground, looked at them, and then turned around and followed them. He caught up to them in a remote spot, where he could most effectively kill and escape. He drove alongside his victims, stopped, said "Girls" to get their attention, and, while Vanessa was looking straight at him and was thus an excellent target, shot and killed her. The inference of cool, calculated premeditation is inescapable.

Additionally, the manner of killing was exact—a single bullet between the eyes by an expert marksman. This strongly implies a preconceived design to kill in precisely that fashion.

Defendant argues there is no evidence of motive. Motive here is, indeed, elusive. This was apparently a random killing for a reason known only to defendant, a reason he has elected not to disclose, as is his right. The Attorney General aptly notes, "The reason persons commit despicable crimes is often a mystery in a land where an accused has a Fifth Amendment privilege." We have never required the prosecution to prove a specific motive before affirming a judgment, even one of first degree murder. A senseless, random, but premeditated, killing supports a verdict of first degree murder.

### 4. *Admissibility of Prosecution Evidence*

#### a. *Defendant's Statement*

Defendant contends the court erred in admitting evidence of his statement in county jail.

At an in camera hearing, Deputy Sheriff Gregory Allen testified that he was on duty in the county jail on January 12, 1983. Defendant asked the deputy to "call me out," i.e., to let him out of his cell. This was a "fairly common occurrence." Deputy Allen let him out, and defendant entered a

vestibule area. Defendant said, " 'I'm depressed, man. May I light a ciga-rette?' " The deputy responded, " 'Yes, go ahead.' " Defendant then made the statement now challenged, " 'Off the record, I'm guilty. I don't know why I shot those two little girls. I'm guilty as sin. I'm depressed for what I put their families through.' " Deputy Allen did not ask defendant any questions. After the hearing, the court admitted the statement, finding it was "spontaneous" and "volunteered," and that there "was no interrogation by the deputy."

Defendant contends that "Deputy Allen had an obligation to terminate the conversation immediately upon Mr. Edward's uttering the qualifying words, 'Off the record'; Allen's failure to do so renders the statement inadmissible." He relies primarily on our decision in *People* v. *Braeseke* (1979) 25 Cal.3d 691 [159 Cal.Rptr. 684, 602 P.2d 384].

In *Braeseke*, the defendant was advised of and waived his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. After some questioning by two officers, he stated he wanted an attorney, and the questioning ceased. Later, during a booking procedure, the defendant asked if he could speak with one officer alone and "off the record." The officer agreed, and eventually took a taped confession. (25 Cal.3d at pp. 695-696.)

We reversed, reasoning that after a defendant asserts his right to counsel the interrogation must cease; it may not be resumed without counsel unless compelling evidence of a waiver of the suspect's rights appears. "When, as here, the defendant has asserted his right to the presence of an attorney that burden [of proving a knowing and intelligent waiver of rights] is particularly onerous [citations] and usually is discharged only by a showing that the defendant initiated without reservation the renewed interrogation. [Cita-tions.]" (25 Cal.3d at p. 702.) We held that a "request to speak 'off the record' cannot constitute a knowing and intelligent waiver of rights which include the advisement that 'anything [a suspect] says can be used against him in a court of law.' [Citations.]" (*Ibid.*) We also pointed out that the officer "contributed to defendant's lack of understanding by agreeing to the request rather than informing defendant that there could be no such thing as an off the record discussion." (*Id.* at p. 703.)

Citing this last sentence, defendant argues that Deputy Allen was required to interrupt him as soon the words "off the record" were spoken. *Braeseke*, *supra*, 25 Cal.3d 691, however, holds only that an officer cannot affirma-tively agree to take an "off the record" statement before recommencing a previously discontinued interrogation. It does not affect the settled rule that volunteered statements not the product of interrogation are admissible.

As *Miranda* itself made clear, "There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 478 [16 L.Ed.2d at p. 726], fn. omitted.)

Deputy Allen asked no questions; he merely listened. He was under no obligation to try to prevent defendant from volunteering the statement.

Defendant next contends the statement was irrelevant. He did not object on this ground at trial, and therefore has waived the point. (*People* v. *Green* (1980) 27 Cal.3d 1, 22 & fn. 8 [164 Cal.Rptr. 1, 609 P.2d 468].) In any event, defendant concedes that the admission that he was "guilty as sin" and the reference to shooting the girls was "an express statement of his culpability for the shootings." This is obviously relevant to the murder charge. His real contention seems directed not so much to the admissibility of the statement itself as to the prosecution argument that it supported the lying-in-wait special circumstance. With one exception, he failed to object to such argument, thus waiving the issue. (*Id.* at p. 34.)

Defendant objected as speculative to rebuttal argument that by using the phrase "guilty as sin," defendant admitted the elements of the lying-in-wait special circumstance. The court overruled the objection, stating that the prosecutor was "entitled to try to convince the jury what he thinks it means." The court was correct. The jury had heard evidence that defendant had been fully informed of the charges against him, and had been present in court when extensive argument was presented regarding the elements of the lying-in-wait special circumstance. This arguably supports the inference the prosecutor was urging. The prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom. (*People* v. *Kelly* (1990) 51 Cal.3d 931, 967 [275 Cal.Rptr. 160, 800 P.2d 516].) Defendant's claim that the argument was illogical was for the jury to decide. As we have repeatedly explained, the adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury. (*People* v. *Warren* (1988) 45 Cal.3d 471, 485, fn. 1 [247 Cal.Rptr. 172, 754 P.2d 218], and cases cited therein.)

Defendant next contends he was "precluded" from presenting rebuttal evidence because the court refused to admit certain hearsay statements he made shortly before and after his arrest on these charges. The correctness of

the court's rulings is discussed in part II. A. 5., *post.* Suffice it to say at this point that the admission of defendant's statement did not somehow entitle him to present inadmissible hearsay. The court never "precluded" defendant from testifying himself or from presenting other testimony consistent with the rules of evidence to rebut this or any other item of prosecution evidence.

Defendant finally claims he was improperly "penalized" for his presence at the court hearing at which issues regarding the lying-in-wait special circumstance were argued. He was not. His presence, coupled with his later statement that he was "guilty as sin," gave rise to a possible relevant inference in the same way that a multitude of actions and events may give rise to relevant inferences. We find no impropriety.

b. *Other Prosecution Evidence*

Defendant contends that other items of prosecution evidence were improperly admitted because they were irrelevant or their prejudicial effect outweighed their probative value under Evidence Code section 352. ▮ In general, the trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value. Its rulings will not be overturned on appeal absent an abuse of that discretion. (*People* v. *Green, supra,* 27 Cal.3d at p. 19; *People* v. *Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91].)

▮ Defendant first objects to evidence regarding his firearms at the gun club where he worked. The court overruled defendant's objection to testimony about storage of the guns, but disallowed as "prejudicial" admission of the weapons themselves. These rulings were within the court's discretion. A number of weapons were found in defendant's truck, and at least one was in the truck cab at the time of the shooting. The prosecution argued this showed preparation for the shooting. The defense established that defendant lived in his truck, and sought to show that he routinely kept his guns there. Evidence that he had an alternate site to store guns was relevant to show that he did not keep weapons in the truck merely out of necessity.

Defendant also contends the record does not show the court weighed the probative value against any prejudicial effect. (*People* v. *Green, supra,* 27 Cal.3d at p. 25.) We have never required any particular formula for engaging in the weighing process so long as the record reflects in some fashion that the court has done so. (*People* v. *Thompson* (1988) 45 Cal.3d 86, 104 [246 Cal.Rptr. 245, 753 P.2d 37].) The fact the court disallowed admission of the

weapons themselves as prejudicial indicates the court properly performed its function.

■ Defendant next contends the court erroneously admitted evidence the two victims were friends. Over objection, the court allowed both Kelly and Vanessa's mother to testify the girls were close friends, but sustained objections to other questions regarding the relationship. This brief testimony was neither particularly probative nor prejudicial. It provided the jury with background information to help it understand the circumstances surrounding the shooting. For example, it suggested that the girls were preoccupied with each other's companionship, and thus were not concerned about the approach of defendant's truck. Allowing this slight touch of humanity was well within the discretion of the trial court. (*People* v. *Carrera* (1989) 49 Cal.3d 291, 330-331 [261 Cal.Rptr. 348, 777 P.2d 121].)

■ Finally, defendant contends the court erred in admitting over objection testimony that shortly after the shooting, Kelly said, " 'I don't want to die. Why me? Is Vanessa all right?' " This testimony was preliminary to other statements by Kelly that the prosecution sought to present as spontaneous statements under Evidence Code section 1240. Ultimately, the latter statements were never introduced. Because of this, the admitted words were of little relevance. They also were the kind of statements any juror would expect Kelly to make under the circumstances, and thus had little, if any, prejudicial effect. We discern no abuse of discretion, and certainly no prejudice.

5. *Exclusion of Defense Evidence*

Defendant was arrested in Maryland on September 28, 1981, nine days after the murder. Some time before this, but apparently after the shooting, defendant recorded certain thoughts in a notebook. For example, he referred to having headaches and feeling sick, and often referred to "Tommy" in the third person. After the arrest, defendant was interviewed on tape at length. He cried at several points, claimed not to remember anything about the shooting and the immediately surrounding events, and complained of headaches. He mentioned the notebook. After the interview, the police, having obtained a search warrant, seized the notebook from defendant's motel room.

At trial, defendant sought to admit into evidence both the notebook and the taped interview without testifying himself. The prosecution objected on hearsay grounds. After a hearing, the court sustained the objection. Later, defendant renewed his motion, and asked the court to read a transcript of the interview. The court did so, and again sustained the hearsay objection.

The court did not state reasons for sustaining the objection at the guilt phase, but did when it sustained a similar objection to the same evidence at the third penalty trial. It specifically found that the statements "were not given under circumstances which would make them trustworthy . . . . [B]oth statements were given under circumstances where they were not indicating that they would be trustworthy." It also found that seeking to admit the evidence without defendant testifying or presenting psychiatric testimony "really is an attempt to put on a whole defense without ever putting the defendant on the stand subject to cross-examination."

■■■ Defendant contends the court erred. He first argues the notebook and interview, though hearsay, were admissible as statements of mental or physical state under either Evidence Code sections 1250 or 1251.[4] We quickly reject the contention under Evidence Code section 1251, which requires that the "declarant [be] unavailable as a witness . . . ." Defendant was certainly not unavailable to himself. Although he possessed, and exercised, a privilege not to testify, the choice was his. He could have testified had he so elected. As stated in the Comment of the Assembly Committee on the Judiciary to Evidence Code section 240, the section defining the phrase "unavailable as a witness," "if the out-of-court statement is that of the party himself, he may not create 'unavailability' under this section by invoking a privilege not to testify."

■■■ Evidence Code section 1250 also does not aid defendant. Assuming, without deciding, that the statements otherwise qualify for admission, Evidence Code section 1250 (like Evidence Code section 1251) is subject to Evidence Code section 1252, which provides, "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness." "The decision

[4]Evidence Code Section 1250 provides:

"(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

"(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or

"(2) The evidence is offered to prove or explain acts or conduct of the declarant.

"(b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

Evidence Code section 1251 provides:

"Subject to Section 1252, evidence of a statement of the declarant's state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) at a time prior to the statement is not made inadmissible by the hearsay rule if:

"(a) The declarant is unavailable as a witness; and

"(b) The evidence is offered to prove such prior state of mind, emotion, or physical sensation when it is itself an issue in the action and the evidence is not offered to prove any fact other than such state of mind, emotion, or physical sensation."

whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception. Such an endeavor allows, in fact demands, the exercise of discretion." (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1251 [270 Cal.Rptr. 451, 792 P.2d 251] [interpreting Evid. Code, § 1230].) A reviewing court may overturn the trial court's finding regarding trustworthiness only if there is an abuse of discretion. (*Id.* at pp. 1250-1251; *People* v. *Frierson* (1991) 53 Cal.3d 730, 745 [280 Cal.Rptr. 440, 808 P.2d 1197].)

 The court did not abuse its discretion. "A defendant in a criminal case may not introduce hearsay evidence for the purpose of testifying while avoiding cross-examination." (*People* v. *Harris* (1984) 36 Cal.3d 36, 69 [171 Cal.Rptr. 679, 623 P.2d 240] (plur. opn. by Broussard, J.).) That rule applies here. To be admissible under Evidence Code section 1252, statements must be made in a natural manner, and not under circumstances of suspicion, so that they carry the probability of trustworthiness. Such declarations are admissible only when they are " 'made at a time when there was no motive to deceive.' " (*People* v. *Howard* (1988) 44 Cal.3d 375, 405 [243 Cal.Rptr. 842, 749 P.2d 279], quoting 6 Wigmore, Evidence (3d ed. 1940) § 1730, p. 94; see also *People* v. *Milner* (1988) 45 Cal.3d 227, 248-249 [246 Cal.Rptr. 713, 753 P.2d 669].)

When defendant made the statements, nine days had elapsed since the shooting. He knew he had killed one 12-year-old girl and had wounded a second. He had a compelling motive to deceive and seek to exonerate himself from, or at least to minimize his responsibility for, the shootings. There was "ample ground to suspect defendant's motives and sincerity" when he made the statements. (*People* v. *Whitt* (1990) 51 Cal.3d 620, 643 [274 Cal.Rptr. 252, 798 P.2d 849].) The need for cross-examination is especially strong in this situation, and fully warrants exclusion of the hearsay evidence. (See also *People* v. *Kaurish* (1990) 52 Cal.3d 648, 704-705 [276 Cal.Rptr. 788, 802 P.2d 278] [self-serving statement tape-recorded shortly after the defendant's arrest properly excluded as inadmissible hearsay]; *People* v. *Cruz* (1968) 264 Cal.App.2d 350, 356-360 [70 Cal.Rptr. 603] [same].)

Defendant next contends that admission of the statements, even if prohibited by the Evidence Code, is constitutionally compelled. We disagree. In limited circumstances, reliable hearsay evidence must be admitted at the penalty phase of a capital trial even if the state rules of evidence provide otherwise. (*Green* v. *Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, 99 S.Ct. 2150]; see *post*, pt. II. C. 3.) Assuming, without deciding, that this rule might also apply to the guilt phase, these statements were

inherently untrustworthy. Defendant was fully allowed to present a defense. He could have testified had he so chosen. (Cf. *Rock* v. *Arkansas* (1987) 483 U.S. 44 [97 L.Ed.2d 37, 107 S.Ct. 2704].) Defendant has no right to effectively "address the jury without subjecting himself to cross-examination." (*People* v. *Whitt, supra,* 51 Cal.3d at p. 644 [evidence of a prison interview with the defendant properly excluded].)

Defendant finally complains that the court did not listen to the tape recordings themselves. The record in this regard is not entirely clear, but we need not decide whether there was error, for it was harmless under any standard. Defendant argues that the "emotional content conveyed" by the tapes was crucial to a ruling on their admissibililty. But the emotion portrayed on the tapes themselves does not obviate the compelling motive to deceive that existed during the interview, nor does it otherwise add sufficient reliability to warrant admission of the tapes.

## B. *Special Circumstance Issues*

### 1. *Lying in Wait*

The jury found that defendant "intentionally killed the victim while lying in wait." (§ 190.2, subd. (a)(15).) Defendant challenges the finding on several grounds. The contentions are generally answered by our recent decision of *People* v. *Morales* (1989) 48 Cal.3d 527, 553-559 [257 Cal.Rptr. 64, 770 P.2d 244]. Defendant argues that *Morales* is distinguishable in certain respects, and should be reconsidered in others. We disagree.

#### a. *Instructional and Constitutional Contentions*

Before the jury could decide the special circumstance question, it had to find defendant guilty of first degree murder. The only theory of first degree murder on which the court instructed was a premeditated and deliberate killing with malice.

The court instructed on lying in wait as follows: "The term 'lying in wait' is defined as a waiting and watching the victim for an opportune time to act, together with the concealment by ambush or some other secret design to take the victim by surprise. The lying in wait need not continue for any particular period of time, provided that its duration is sufficient to establish beyond a reasonable doubt, one, the elements of waiting, watching and concealment or other secret design to take the victim unawares and by surprise; and two, that

during the period of lying in wait the defendant had the intention to kill the victim . . . .[5]

"If the murder is done suddenly, without a period of waiting, watching and concealment, the special circumstance of lying in wait is not present. [¶] The term 'lying in wait' does not require a showing that the defendant was in a position of lying down. He may be shown to be sitting or standing, and he may be stationary or in motion. The requirement of concealment does not require that the defendant be not visible to the victim, nor that the victim be totally unaware of the physical presence of the defendant. Concealment may be shown by either an ambush or by the defendant's intentional creation[6] of a situation where the victim is taken unawares and by surprise, even though the victim sees the defendant.

"In order to find the special circumstance of lying in wait to be true, you must also find beyond a reasonable doubt that the lying in wait continued up to the moment of the killing, without interruption of time between lying in wait and the act of killing."

When the court reinstructed the jury during deliberations, it added at defense request: "Before you may find that a murder was committed while lying in wait, the prosecution is required to prove something more than just . . . first degree murder."

In *People* v. *Morales, supra,* 48 Cal.3d at page 557, we held that "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage, presents a factual matrix sufficiently distinct from 'ordinary' premeditated murder to justify treating it as a special circumstance." We upheld a lying-in-wait finding against a defendant who, in plain view, sat behind his intended victim in an automobile and waited until the car was in a more deserted location before attempting to strangle her and eventually bludgeoning her to death.

Defendant asserts the instructions of this case were deficient under *Morales, supra,* 48 Cal.3d 527. As we explain, the actual instructions fulfill

---

[5]The court originally added the phrase "or cause her great bodily harm" at this point. During deliberations, however, it expressly deleted that phrase, and told the jury it had to find an intent to kill, not merely to cause great bodily harm.

[6]When the court reread these instructions during deliberations, it apparently misspoke, and used the word "consideration" instead of "creation." This mistake could not have prejudiced defendant. The court correctly instructed the jury originally, and the prosecutor correctly read this instruction in his argument to the jury. (See *People* v. *Heishman* (1988) 45 Cal.3d 147, 164 [246 Cal.Rptr. 673, 753 P.2d 629].)

all of the legal requirements even though the words are not always precisely the same as we used in *Morales* (which is not surprising since the trial predated that opinion).

Defendant first claims that the instructions erroneously require only a "mere concealment of purpose" to establish lying in wait. He focuses, however, on only one of the instructional requirements. The instructions also required waiting and watching for an opportune time to act, an intent to kill, and no interruption of time between lying in wait and the killing.

Defendant next contends the instructions do not require, in the words of *Morales*, *supra*, 48 Cal.3d at page 557, a "position of advantage." That precise phrase is not found in the instructions, but the meaning is. An ambush or a "situation where the victim is taken unawares and by surprise," combined with an intent to kill, necessarily places the intended killer in a position of advantage. We did not require any particular phraseology in *Morales*, only the substance.

Defendant next contends the instructions do not require a "substantial" period of waiting and watching. Again, the specific word "substantial" was not used. However, the jury was told that the lying in wait must be of sufficient duration to establish the elements of waiting, watching and concealment or other secret design to take the victim unawares and by surprise, and that a murder done suddenly without such waiting, watching and concealment is not murder by lying in wait. These requirements necessarily include a substantial temporal element. We have never required a certain minimum period of time, only a period not insubstantial. The instructions sufficiently convey this meaning.

Defendant also reiterates some contentions rejected in *Morales*. As explained in that decision, concealment of physical presence is not a requirement of lying in wait. (48 Cal.3d at pp. 554-556.) We also held that the lying-in-wait special circumstance, as interpreted in that and prior decisions, is constitutional. (*Id.* at pp. 557-558; accord *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1023 [254 Cal.Rptr. 586, 766 P.2d 1].) We decline defendant's invitation to reconsider these decisions.

Defendant makes additional contentions not specifically addressed in *Morales*. He claims the lying-in-wait special circumstance impermissibly duplicates the special circumstances involving murder by explosive devices and by poison. (§ 190.2, subd. (a)(4), (6) & (19); see *People* v. *Montiel* (1985) 39 Cal.3d 910, 927 [218 Cal.Rptr. 572, 705 P.2d 1248].) However, under the instructions, a murder by explosive device or poison would also be by lying in wait only if the actual use of the explosive device or poison was

contemporaneously with, or immediately following, the lying in wait. There is no substantial overlap among these special circumstances, and certainly not so much as to invalidate any of them.

Defendant claims the special circumstance is unconstitutionally vague because it fails "to provide notice, guidance or any principled method to identify a class of murderers that are more deserving of death." On the contrary, as interpreted in *Morales* and prior decisions, it has specific and clear requirements which sufficiently distinguish a lying-in-wait murder from other first degree murders to justify treating it as a special circumstance. (*People* v. *Morales*, *supra*, 48 Cal.3d at p. 557; *People* v. *Edelbacher*, *supra*, 47 Cal.3d at p. 1023.)

Defendant also contends that *Morales* changed the law, and that applying it to this case would violate ex post facto principles. On the contrary, *Morales* merely applied established law. (*People* v. *Webster* (1991) 54 Cal.3d 411, 448, fn 21 [285 Cal.Rptr. 31, 814 P.2d 1273].)

 Defendant next argues that the court was required sua sponte to instruct the jury under CALJIC No. 17.01 that it had to agree unanimously which acts constituted the lying in wait. We disagree. "A requirement of jury unanimity typically applies to acts that could have been charged as separate offenses." (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 92 [279 Cal.Rptr. 276, 806 P.2d 1311].) "A jury may convict a defendant of first degree murder, however, without making a unanimous choice of one or more of several theories proposed by the prosecution, e.g., that the murder was deliberate and premeditated or that it was committed in the course of a felony." (*Ibid.*) " '[I]t is sufficient that each juror is convinced beyond a reasonable doubt that the defendant is guilty of first degree murder as that offense is defined by the statute.' " (*Ibid.*, quoting *People* v. *Milan* (1973) 9 Cal.3d 185, 195 [107 Cal.Rptr. 68, 507 P.2d 956].) This rule passes federal constitutional muster. (*Schad* v. *Arizona* (1991) 501 U.S. __, __-__, __-__ [115 L.Ed.2d 555, 564-574 (plur. opn.), 576-578 (conc. opn. of Scalia, J.), 111 S.Ct. 2491, 2496-2504, 2505-2507].) The same rationale applies to the special circumstance of lying in wait. A unanimity instruction is not required.[7]

Defendant also claims that because there was no evidence that he physically concealed his presence, the court was required sua sponte to delete from the instructions all reference to concealment of presence. However, full and correct instructions on the elements of lying in wait were appropriate,

---

[7]Defendant also claims he was given insufficient notice of the lying-in-wait charge. The claim is specious. He was charged with the statutory special circumstance at an early stage. He does not claim he received inadequate discovery. This was sufficient.

and could not have misled the jury. No one suggested there was physical concealment, only that it was one way, but not the only way, to establish lying in wait.[8]

b. *Sufficiency of the Evidence of Lying in Wait*

██ Defendant contends there is insufficient evidence to support the lying-in-wait special circumstance. We disagree. After drawing all reasonable inferences in support of the verdict (see *ante*, pt. II. A. 3.), we find sufficient evidence to support each of the elements of lying in wait. The trial court's summary is apt. "There was watching and waiting from inside the campgrounds out to the road. There was a secret plan to take them by a surprise which was as effective as any ambush that he could have accomplished from hiding, and perhaps even more so because this way he didn't have to wait behind a tree or a rock hoping that they would come his way. In this way he was able to move his point of ambush right directly in front of the girls."

Defendant first claims there is no evidence of concealment to gain a position of advantage. To be sure, he did not conceal his physical presence, but that is not required. (*People* v. *Morales, supra,* 48 Cal.3d at p. 555.) A concealment of purpose suffices if it is combined with a surprise attack on an unsuspecting victim from a position of advantage. (*Id.* at pp. 555, 557; *People* v. *Webster, supra,* 54 Cal.3d at p. 448.) Defendant drove alongside the victims where there were no witnesses and where they would be most vulnerable. While they were completely unsuspecting, he called to them so they would look his way and become ideal live targets. After gaining this position of advantage, he shot and killed.

Defendant next claims there is no evidence of waiting and watching. Again, we disagree. Defendant was first seen entering the campground about three hours before the shooting. He then reentered it, and observed his victims going in the opposite direction. Rather than shoot them when he first saw them, he turned around, followed them, and, when they had reached the most isolated spot in the area, struck. He knew the area well from prior visits. The jury could reasonably infer defendant waited and watched until the girls reached the place of maximum vulnerability before shooting. This was sufficient. A killer need not view his intended victim during the entire period of watching and waiting. (See *People* v. *Morales, supra,* 48 Cal.3d at p. 555.)

There was also evidence of a substantial period of watching and waiting. The jury could reasonably find that defendant first saw the victims as they

---

[8]Defendant makes other summary challenges to the instructions. Since he does not develop the arguments, and they are specious in light of the actual instructions, we reject them.

were walking by a restroom near the entrance to the Blue Jay campground, and that he turned around and followed them. Since more than a quarter of a mile separated the spot where defendant first saw the girls and where he shot them, and they were on foot, the jury could reasonably infer that a matter of minutes elapsed from the time defendant first saw them until he shot them. This was substantial.

Defendant claims he did not kill "while" lying in wait, i.e., the lying in wait did not "result in an opportune moment for attack, provide a position of advantage, or put the decedent in a particular state of vulnerability." However, it did all of these. The evidence suggests that the lying in wait might have been crucial to defendant's murderous design; it certainly furthered it. Vanessa, the victim most taken by surprise, was shot between the eyes when she looked at defendant upon hearing his call. Kelly, the second target, had a brief moment to react, and turned her head, thus affecting defendant's aim enough to survive. Moreover, the shooting occurred without any "cognizable interruption" following the lying in wait under any legal standard. (Cf. *Domino* v. *Superior Court* (1982) 129 Cal.App.3d 1000, 1011 [181 Cal.Rptr. 486], with *People* v. *Morales, supra,* 48 Cal.3d at p. 558.)

Defendant also challenges the prosecution reliance on the evidence that his truck was first seen entering the campground around 11 that morning. The witness testified he was "reasonably sure" it was defendant's truck. This evidence, although alone far from dispositive, was relevant, and the prosecution properly relied on it as one bit of evidence supporting the special circumstance.

Sufficient evidence supports each element of the lying-in-wait special circumstance.

### 2. *Alleged Vindictive, Discriminatory and Capricious Prosecution*

On September 22, 1981, three days after the shooting, and before defendant's arrest, a complaint was filed and a warrant for defendant's arrest was obtained. The complaint charged first degree murder but no special circumstance. Defendant was arrested in Maryland on September 28. Twelve days later, on October 10, 1981, an amended complaint was filed charging the lying-in-wait special circumstance. ▮ Defendant claims the amendment was unlawful because it was discriminatory, capricious, and a vindictive retaliation for defendant's assertion of the right to counsel, his temporary refusal to waive extradition, and his eventual refusal to talk to the police.

The Attorney General argues that the issue is not properly before us because defendant neither moved to dismiss the amended complaint nor otherwise objected on this basis. We agree. "[B]ecause a claim of discriminatory prosecution generally rests upon evidence completely extraneous to the specific facts of the charged offense, we believe the issue should not be resolved upon evidence submitted at trial, but instead should be raised . . . through a pretrial motion to dismiss." (*Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286, 293-294, fn. 4 [124 Cal.Rptr. 204, 540 P.2d 44].) This rationale applies to claims of vindictive prosecution. (See also *People* v. *Toro* (1989) 47 Cal.3d 966, 976 [254 Cal.Rptr. 811, 766 P.2d 577] [defendant must object to amendment of information at trial to preserve a lack-of-notice objection]; *People* v. *Sperl* (1976) 54 Cal.App.3d 640, 656-657 [126 Cal.Rptr. 907].)

Defendant argues he repeatedly objected to the lying-in-wait charge. True, but not on this basis. He also claims he raised the issue during jury selection on February 11, 1983. At that time, defendant requested a "proportionality hearing" under the then recent decision of *Harris* v. *Pulley* (9th Cir. 1982) 692 F.2d 1189, 1196, reversed *sub nomine Pulley* v. *Harris* (1984) 465 U.S. 37 [79 L.Ed.2d 29, 104 S.Ct. 871]. (In *Pulley* v. *Harris, supra*, the United States Supreme Court ultimately reversed the Ninth Circuit's decision, and held that proportionality review of capital cases is not necessary.) Portions of the defense argument would have been relevant to a claim of vindictive prosecution had that claim been made. The claim, however, was never actually made. The instant contention is not properly before us.

The contention is also meritless. Defendant claims the district attorney amended the complaint in retaliation for his exercise of constitutional rights. (See generally *In re Bower* (1985) 38 Cal.3d 865 [215 Cal.Rptr. 267 [700 P.2d 1269]; *Twiggs* v. *Superior Court* (1983) 34 Cal.3d 360 [194 Cal.Rptr. 152, 667 P.2d 1165].) He relies largely on media reports that the sheriff and to a lesser extent a deputy district attorney criticized the early involvement of the public defender in the case.

We start our analysis by observing that generally a complaint or information may be amended even as late as trial. (§ 1009; *People* v. *Witt* (1975) 53 Cal.App.3d 154, 165 [125 Cal.Rptr. 653].) Here, the amendment was filed within two weeks of defendant's arrest, even before the preliminary hearing, and well over a year before trial.

In *In re Bower, supra*, 38 Cal.3d at pages 874-877, and *Twiggs* v. *Superior Court, supra*, 34 Cal.3d at pages 369-374, we found a presumption of vindictiveness when charges were increased after the assertion of constitutional rights and *after jeopardy had attached*. As stated in *Bower, supra*: "The

timing of the prosecutor's action is important because '[a] prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct. [Fn. omitted.] As we made clear in *Bordenkircher* [v. *Hayes* (1978) 434 U.S. 357 (54 L.Ed.2d 604, 98 S.Ct. 663)], the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution.' ([*United States* v. *Goodwin* (1982) 457 U.S. 368, 382 (73 L.Ed.2d 74, 86, 102 S.Ct. 2485)].)

"The court [in *United States* v. *Goodwin*] noted that an important factor in assessing the timing element is the attachment of jeopardy. At the pretrial stage 'the prosecutor's assessment of the proper extent of prosecution may not have fully crystallized. *In contrast, once a trial begins*—and certainly by the time a conviction has been obtained—it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted.' ([457 U.S. 368, 381, (73 L.Ed.2d 74, 85), italics added in *Bower*].)" (*In re Bower, supra,* 38 Cal.3d at pp. 875-876, quoting *United States* v. *Goodwin* (1982) 457 U.S. 368 [73 L.Ed.2d 74, 102 S.Ct. 2485].)

The initial complaint of this case was filed within three days of the crime, even before defendant was arrested. It is natural, not suspicious, that at that point the prosecution had not "discovered and assessed all of the information" against defendant. (*In re Bower, supra,* 38 Cal.3d at p. 875.) It is not surprising the prosecution did not fully assess a possible lying-in-wait special circumstance while defendant was still at large and the most pressing need was to obtain an arrest warrant. Deciding whether to charge a special circumstance is obviously a major decision, one not to be rushed. The judicial process serves to weed out inflated charges. As discussed *ante*, in part II. B. 1., the lying-in-wait special circumstance was fully warranted by the evidence. It was charged within days of defendant's arrest, and thereafter consistently and effectively prosecuted. There is no hint, much less an affirmative showing, of vindictive prosecution.

Defendant also claims the prosecution was discriminatory and capricious. He asserts, without evidentiary support, that "others, similarly situated, were not prosecuted [in Orange County] for lying in wait . . . ." Even if the record supported the claim that the Orange County District Attorney does not prosecute all lying-in-wait cases (it does not), this would not state a claim of discriminatory prosecution.

In *People* v. *Keenan* (1988) 46 Cal.3d 478 [250 Cal.Rptr. 550, 758 P.2d 1081], we upheld a refusal to grant the defendant discovery about the San

Francisco District Attorney's capital charging policies and practices to aid in a claim of arbitrary charging. "[P]rosecutorial discretion to select those eligible cases in which the death penalty will actually be sought does not in and of itself evidence an arbitrary and capricious capital punishment system or offend principles of equal protection, due process, or cruel and/or unusual punishment. [Citations.] [¶] Many circumstances may affect the litigation of a case chargeable under the death penalty law. These include factual nuances, strength of evidence, and, in particular, the broad discretion to show leniency. Hence, one sentenced to death under a properly channeled death penalty scheme cannot prove a constitutional violation by showing that other persons whose crimes were superficially similar did not receive the death penalty. [Citations.] The same reasoning applies to the prosecutor's decisions to pursue or withhold capital charges at the outset." (*Id.* at pp. 505-506.)

The district attorney prosecuted this case vigorously, as well he might. Vigorous prosecution is not capricious prosecution. This crime, involving the effective execution of one 12-year-old girl and the attempted execution of another, is particularly aggravated. It cannot be compared to other superficially similar lying-in-wait cases. (See *People* v. *Keenan, supra,* 46 Cal.3d at p. 506.) There was no impropriety in prosecuting this as a capital case.

C. *Penalty Phase Issues*

1. *Jury Selection*

a. *Restrictions on Voir Dire*

Defendant argues the trial court improperly limited his questioning of 11 prospective jurors during selection of the jury that returned the death verdict now under review.

In *People* v. *Williams* (1981) 29 Cal.3d 392, 407 [174 Cal.Rptr. 317, 628 P.2d 869], we held that counsel "should be allowed to ask questions reasonably designed to assist in the intelligent exercise of peremptory challenges whether or not such questions are also likely to uncover grounds sufficient to sustain a challenge for cause." We also, however, expressly "le[ft] intact the considerable discretion of the trial court to contain voir dire within reasonable limits." (*Id.* at p. 408; see *People* v. *Mason* (1991) 52 Cal.3d 909, 939 [277 Cal.Rptr. 166, 802 P.2d 950].)[9]

---

[9]The passage of Proposition 115 has significantly changed the law in this regard. (Prop. 115, § 7, codified as Code Civ. Proc., § 223; see *Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 286-287 [279 Cal.Rptr. 592, 807 P.2d 434]; *Raven* v. *Deukmejian* (1990) 52 Cal.3d 336,

Our review of the record discloses that in general the court allowed a wide scope of voir dire, and the limits it imposed were within its considerable discretion. But we need not discuss the merits in detail, for defendant has failed to show prejudice even if we assume an occasional abuse of discretion.

In *People* v. *Bittaker* (1989) 48 Cal.3d 1046 [259 Cal.Rptr. 630, 774 P.2d 659], the trial court posed four questions to the prospective jurors regarding their attitude towards the death penalty. It sometimes asked further questions, but did not allow the attorneys to ask questions on the subject. (*Id.* at pp. 1081-1082.) We found the procedure unduly restrictive, but rejected the argument that the error was reversible per se. "Judicial limitations on voir dire vary in scope and severity, and in their impact on the jury selection and the ultimate outcome of trial. We see no reason why the courts should not recognize those differences, and limit reversals to those cases in which the erroneous ruling affected defendant's right to a fair and impartial jury." (*Id.* at p. 1086.)

The court here restricted counsel far less than in *Bittaker*. None of the 11 jurors involved in the restrictions sat on the actual jury. When defendant accepted the jury, he had 10 peremptory challenges remaining. Our conclusion in *Bittaker* applies equally to this case: "When the jury was finally selected, defendant did not claim that any juror was incompetent, or was not impartial. We therefore find no prejudicial error." (48 Cal.3d at p. 1087.)

b. *Denial of Challenges for Cause*

■ Defendant next argues the court erred in denying his challenge for cause as to 11 prospective jurors (many of them the same as those involved in the voir dire restrictions discussed in the previous contention). Again, our review of the record discloses no error but defendant has failed to show prejudice even assuming the court erred as to all 11. None sat on the actual jury; each was either challenged peremptorily by defendant or was never seated in the jury box. The 10 peremptory challenges defendant had when he accepted the jury exceeded the total number of remaining prospective jurors that were involved in the restricted voir dire or were unsuccessfully challenged for cause by defendant. Defendant did not express dissatisfaction with the jury as selected. Any erroneous inclusion of prospective jurors was therefore harmless. (*Ross* v. *Oklahoma* (1988) 487 U.S. 81, 87-89 [101

---

344 [276 Cal.Rptr. 326, 801 P.2d 1077].) Because of our disposition of this issue, we need not consider the effect of the new provision on this case.

L.Ed.2d 80, 89-91, 108 S.Ct. 2273]; *People* v. *Cooper, supra,* 53 Cal.3d at p. 808, and cases cited therein.)

Defendant claims he was afraid to use more peremptory challenges for fear the actual panel would only get worse. Nothing in the record supports the claim. He never suggested such concerns at trial, and never requested additional peremptory challenges. Defendant also cites *Gray* v. *Mississippi* (1987) 481 U.S. 648 [95 L.Ed.2d 622, 107 S.Ct. 2045] for the proposition that any error is reversible per se. *Gray,* however, involves the erroneous *exclusion* of a prospective juror because of views on the death penalty. The subsequent decision of *Ross* v. *Oklahoma, supra,* 487 U.S. 81, which rejects a reversible per se rule, controls the erroneous *inclusion* of jurors. (See *People* v. *Cooper, supra,* 53 Cal.3d at pp. 808-809.)

c. *Peremptory Challenges of Jurors Who Disliked Death Penalty*

 Defendant claims the district attorney improperly used his peremptory challenges to excuse prospective jurors who expressed "even the slightest reservation and concern about the death penalty." We have repeatedly rejected the contention. (E.g., *People* v. *Gordon, supra,* 50 Cal.3d at p. 1263.) Defendant urges us to follow a federal district court decision, apparently the only court ever to find merit in his position. (*Brown* v. *Rice* (W.D.N.C. 1988) 693 F.Supp. 381, revd. *sub nom. Brown* v. *Dixon* (4th Cir. 1989) 891 F.2d 490, 496-498, cert. den. (1990) 495 U.S. 953 [109 L.Ed.2d 545, 110 S.Ct. 2220].) We are not persuaded. Nor was the circuit court that *reversed* that decision on this very point. (*Brown* v. *Dixon, supra.*) We agree with the circuit court, and with the opinion of Justice O'Connor concurring in the denial of certiorari in an earlier appeal of the same case. (*Brown* v. *North Carolina* (1986) 479 U.S. 940, 940-942 [93 L.Ed.2d 373, 107 S.Ct. 423] (conc. opn. of O'Connor, J.); cf. the dissenting opinion of Justice Brennan in the same case, *id.* at pp. 942-945 [93 L.Ed.2d at pp. 375-377].)

2. *Admissibility of Prosecution Evidence*

a. *Evidence of the Search for Defendant*

 Over defense objection, the court admitted evidence that for five days after the shooting, multijurisdictional law enforcement personnel conducted a massive but futile ground and air search for defendant. Defendant argues that the evidence was not relevant to any aggravating factor and was unduly prejudicial. However, evidence relating to the circumstances of the crime is admissible at the penalty phase. (§ 190.3, factor (a); *People* v. *Carrera, supra,* 49 Cal.3d at p. 336.) "The question thus remains whether the

testimony was relevant, and whether its probative value outweighed any prejudicial effect." (*Carrera, supra,* at p. 336.)

The court acted within its discretion. Contrary to defendant's argument, the evidence did not relate merely to police activity but, by reasonable inference, to his own actions. It was relevant for the jury to know that despite a major manhunt, defendant had the presence of mind after the shooting to elude capture and slip out of the area. This suggests advance planning and, rather than remorse, a cool determination to avoid the consequences of his actions. It also tends to negate a possible defense claim that the shooting was a spur-of-the-moment affair by a momentarily deranged individual.

The evidence was not particularly prejudicial. Defendant claims it showed the police considered him especially dangerous. No doubt. But that proved only the obvious. Once the jury learned the facts of the shooting, it knew that defendant *was* dangerous. That massive efforts would be undertaken to capture him was to be expected. What was less obvious, but relevant, was that defendant eluded those efforts. There was no error.

### b. *Photographs of the Victims*

 Over objection, the court admitted into evidence three photographs of the victims while alive—one of both Kelly and Vanessa taken at the campground the night before the shooting, and two of Kelly taken about a month later. The latter two showed a bandanna around Kelly's head. The court initially admitted only the photograph of the two girls, finding that it "shows the girls, arguably, as they were walking down the roadway. It shows the girls as the defendant saw them, arguably." Later, the court admitted the two photographs of Kelly. She had grown substantially in the five years between the crime and the third trial, and the photographs showed her stature at the time defendant shot her. None of the photographs had been admitted at the first trial.

Defendant contends the photographs were "inflammatory and irrelevant." They were not, and the court did not abuse its discretion in admitting them. (*People* v. *Carrera, supra,* 49 Cal.3d at p. 329.) They depict the victims at the time of the crimes, not as Kelly looked at trial five years later. They properly aided the jury in judging the size, age and vulnerability of the victims. (*People* v. *Frank* (1990) 51 Cal.3d 718, 734 [274 Cal.Rptr. 372, 798 P.2d 1215].)

Defendant contends the photographs (and the prosecution argument referring to the impact of the crime on Vanessa's family—see part II. C. 4., *post*)

were improper under *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] (*Booth*) and *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207] (*Gathers*), which generally barred admission of victim impact evidence and related prosecution argument during the penalty phase of a capital trial. During the pendency of this appeal, however, those holdings were overruled. (*Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597] (*Payne*).) In *Payne*, the high court held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." (*Id.* at p. __ [115 L.Ed.2d at p. 736, 111 S.Ct. at p. 2609].) It also held "that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." (*Id.* at p. __ [115 L.Ed.2d at p. 735, 111 S.Ct. at p. 2608].)

We requested and received supplemental briefing on the impact of *Payne* on this case. Defendant now contends that even aside from Eighth Amendment considerations, victim impact evidence is inadmissible in California because it does not come within any of the aggravating factors listed in section 190.3. (See *People* v. *Boyd, supra,* 38 Cal.3d 762, 775-776.) One of the statutory aggravating factors is the "circumstances of the crime of which the defendant was convicted in the present proceeding . . . ." (§ 190.3, factor (a).) The issue is thus whether "evidence of the specific harm caused by the defendant" (*Payne, supra,* 501 U.S. at p. __ [115 L.Ed.2d at p. 735, 111 S.Ct. at p. 2608]) is a circumstance of the crime admissible under factor (a). We think it generally is.

 In construing statutes, we apply the usual, ordinary import of the language used. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].) The word "circumstances" as used in factor (a) of section 190.3 does not mean merely the immediate temporal and spatial circumstances of the crime. Rather it extends to "[t]hat which surrounds materially, morally, or logically" the crime. (3 Oxford English Dict. (2d ed. 1989) p. 240, "circumstance," first definition.) The specific harm caused by the defendant does surround the crime "materially, morally, or logically."

Defendant relies primarily on language from *People* v. *Gordon, supra,* 50 Cal.3d at pages 1266-1267: "In the general case—and certainly here—the effect of the crime on the victim's family is not relevant to any material

circumstance. Nor is sympathy for the victim. Obviously, evidence on these matters is inadmissible. Just as obviously, argument on them is barred. It is manifest that the remark was improper under *Boyd* in these respects." The remark found improper was, " 'Not only did the defendant take William Wiley's life and his entire future and destroy his family, he now wants to take sympathy away from him too. The sympathy that is rightfully due William Wiley.' " (*Id.* at p. 1266.)

*Gordon, supra*, 50 Cal.3d 1223, cites only the general language of *Boyd, supra*, 38 Cal.3d 762, in finding state-law error. In the next paragraph, it also finds error under *Booth* and *Gathers*. (50 Cal.3d at p. 1267.) Its conclusion on the state-law question was colored by these now overruled decisions, and must be reconsidered in light of *Payne* and other decisions by this court.

The leading pre-*Booth* case is *People* v. *Haskett* (1982) 30 Cal.3d 841 [180 Cal.Rptr. 640, 640 P.2d 776]. There the prosecutor invited the jurors "to put themselves in the shoes of Mrs. Rose [the attempted murder victim and mother of the two murder victims] and imagine suffering the acts inflicted on her." (*Id.* at p. 863.) We permitted these comments: "Although appeals to the sympathy or passions of the jury are inappropriate at the guilt phase [citation], at the penalty phase the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death. It is not only appropriate, but necessary, that the jury weigh the sympathetic elements of defendant's background against those that may offend the conscience. [Citations.] In this process, one of the most significant considerations is the nature of the underlying crime. (See Pen. Code, § 190.3, [factor] (a).) Hence assessment of the offense from the victim's viewpoint would appear germane to the task of sentencing." (*Id.* at pp. 863-864.)

Thus, before *Booth* we found argument regarding the suffering the defendant inflicted proper as a circumstance of the crime under factor (a) of section 190.3.[10] Although the mother in *People* v. *Haskett, supra*, 30 Cal.3d 841, was both a victim of noncapital crimes and a relative of the murder victims, nothing in that opinion suggests the jury could consider her suffering only as a direct victim and not also as a relative of the murder victims.

In *People* v. *Douglas* (1990) 50 Cal.3d 468, 536 [268 Cal.Rptr. 126, 788 P.2d 640], the prosecutor argued, " 'What huge offense that is, and then on

---

[10]The crime in *Haskett, supra*, 30 Cal.3d 841, was committed under the 1977 law, not the current 1978 law, and hence was not subject to the *Boyd* (*supra*, 38 Cal.3d 762) restriction. (See *People* v. *Hovey, supra*, 44 Cal.3d 543, 575.) However, factor (a) of section 190.3 is identical under both statutes. Thus, to the extent *Haskett* interprets that factor, it is relevant to this case.

top of that, what does it do to that person's family? This is a tragedy, not just for the person you killed, but the family and society . . . .' " We found no error in this and other comments, finding that they "merely emphasized the aggravating *circumstances of the crime*, namely, the inhumane nature of the violent acts inflicted on two victims . . . ." (*Id.* at p. 537, italics added.)

In *People* v. *Benson* (1990) 52 Cal.3d 754, 795-797 [276 Cal.Rptr. 827, 802 P.2d 330], we upheld argument regarding the impact *other* criminal conduct of the defendant had upon the victims. We expressly left open the question whether *Booth* or *Gathers* would prohibit other kinds of evidence such as "the emotional impact of such criminal activity on the victim's family . . . ." (*Id.* at p. 797, fn. 9.) We now know there is no such prohibition. *Benson* strongly implies that such evidence comes within section 190.3, factor (b), "criminal activity" involving force or violence. If victim impact evidence is permitted under factor (b), it should certainly be permitted under factor (a).

The assumption in *Gordon, supra,* 50 Cal.3d at page 1267, that the "effect of the crime on the victim's family is not relevant to any material circumstance," is suspect in light of these cases, and was largely based on *Booth* and *Gathers.* The assumption is no longer valid under *Payne,* which explained, "the assessment of harm caused by the defendant as a result of the crime charged has understandably been an important concern of the criminal law, both in determining the elements of the offense and in determining the appropriate punishment." (501 U.S. at p. __ [115 L.Ed.2d at p. 725, 111 S.Ct. at p. 2605].) Generally speaking, "victim impact evidence serves entirely legitimate purposes. In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." (*Id.* at p. __ [115 L.Ed.2d at p. 735, 111 S.Ct. at p. 2608].)

For these reasons, we believe that the injury inflicted is generally a circumstance of the crime as that phrase is commonly understood. We need not divorce the injury from the acts. ■ We thus hold that factor (a) of section 190.3 allows evidence and argument on the specific harm caused by the defendant, including the impact on the family of the victim. This holding only encompasses evidence that logically shows the harm caused by the defendant. We do not now explore the outer reaches of evidence admissible as a circumstance of the crime, and we do not hold that factor (a) necessarily

includes all forms of victim impact evidence and argument allowed by *Payne, supra,* 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597].[11]

Our holding also does not mean there are no limits on emotional evidence and argument. In *People v. Haskett, supra,* 30 Cal.3d at page 864, we cautioned, "Nevertheless, the jury must face its obligation soberly and rationally, and should not be given the impression that emotion may reign over reason. [Citation.] In each case, therefore, the trial court must strike a careful balance between the probative and the prejudicial. [Citations.] On the one hand, it should allow evidence and argument on emotional though relevant subjects that could provide legitimate reasons to sway the jury to show mercy or to impose the ultimate sanction. On the other hand, irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be curtailed." (See also the cautionary language in *Payne, supra,* 501 U.S. at p. __ [115 L.Ed.2d 735, 111 S.Ct. at p. 2608], quoted previously.)

 Under this standard, the photographs were clearly admissible. Although we have cautioned against admitting irrelevant photographs of the victims while alive at a *guilt* phase (*People v. Thompson, supra,* 45 Cal.3d at p. 115, and cases cited therein), the same considerations do not apply at a penalty phase. Evidence irrelevant and prejudicial to determining guilt may be relevant to judging the appropriate punishment once guilt is established. (*People v. Cox* (1991) 53 Cal.3d 618, 687-688 [280 Cal.Rptr. 692, 809 P.2d 351].) Defendant assaulted both girls depicted in the photographs. Whatever the photographs suggested of the preciousness of their lives was relevant to determining the proper punishment for taking one of those lives, and attempting to take the other. (*Id.* at p. 688.)

c. *Other Prosecution Evidence*

 Defendant contends the court erred in admitting, over objection, other items of evidence. The court allowed Vanessa's mother to testify about the girls' friendship, her search for her daughter, and her seeing her daughter at the hospital. Evidence about the friendship aided the jury to understand the shooting, including that the girls might have been preoccupied with each other and thus presented easy targets for defendant. (See *People v. Carrera, supra,* 49 Cal.3d at pp. 330-331 [admitting similar testimony at the

---

[11]By quoting certain language out of context, the concurring and dissenting opinion claims the Attorney General "effectively concedes the point." (Conc. & dis. opn. by Mosk, J., *post,* at p. 854.) The Attorney General went on to state: "Victim impact evidence which does not relate to a statutory aggravating circumstance under Penal Code section 190.3 remains inadmissible in California. (See, *People v. Boyd* (1985) 38 Cal.3d 762, 772-780.)" The Attorney General did not concede the instant issue; he accurately stated it.

guilt phase].) The testimony about the mother looking for her daughter was exactly what the jury would expect. It was factual and unemotional, and was admissible as a circumstance of the crime.

As with the guilt phase, defendant objects to penalty phase testimony regarding his firearms found in a storage area of the gun club. For the reasons previously discussed (see, *ante*, at pt. II. A. 4. b.), this evidence was properly admitted to aid the jury assess the crime.

Defendant finally objects to testimony by a police officer that at the time of the crime, unlike the time of trial, Kelly was "small, fragile." This testimony, like the photographs of the victims, was relevant to the circumstances of the crime and to judging defendant's moral culpability.

3. *Exclusion of Defense Evidence*

At the penalty phase, defendant unsuccessfully renewed his motion to admit his taped statement to the police after his arrest and the notebook he compiled after the shooting. (See, *ante*, at pt. II. A. 5.) Defendant reiterates the arguments we have already rejected. He also argues that the court violated his federal constitutional right at the penalty phase to have the sentencer consider all "relevant mitigating evidence." (See *Payne, supra*, 501 U.S. at p. __ [115 L.Ed.2d at p. 733, 111 S.Ct. at p. 2606]; *Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 6, 106 S.Ct. 1669]; *People* v. *Whitt, supra*, 51 Cal.3d at p. 647.)

Defendant contends that this constitutional right entitles him to present any evidence relevant to mitigation in any form he desires, even if the prosecution right of cross-examination is thereby defeated. We agree that the "range of constitutionally pertinent mitigation is . . . broad." (*People* v. *Whitt, supra*, 51 Cal.3d at p. 647.) But neither this court nor the high court has suggested that the rule allowing all relevant mitigating evidence has abrogated the California Evidence Code.

In *Green* v. *Georgia, supra*, 442 U.S. 95, the high court considered when a state's rules of evidence must yield to the constitutional right to present evidence at the penalty phase of a capital case. In *Green*, the defendant attempted to show that he was not an active participant in the murder of which he was convicted. He offered the testimony of a witness that another person admitted killing the victim. The trial court refused to admit the statement under Georgia law which, unlike California law, had no exception to the hearsay rule for declarations against penal interest. Under these "unique circumstances," the court found a due process violation. (*Id.* at p. 97.) "*Green* held that a defendant's due process rights are violated when

hearsay testimony at the penalty phase of a capital trial is excluded, if both of the following conditions are present: (1) the excluded testimony is 'highly relevant to a critical issue in the punishment phase of the trial,' and (2) there are substantial reasons to assume the reliability of the evidence." (*People* v. *Kaurish, supra,* 52 Cal.3d at p. 704, quoting *Green, supra,* at p. 97; see also *People* v. *Frierson, supra,* 53 Cal.3d at p. 746.)

As discussed previously (*ante,* at pt. II. A. 5.), defendant's statements were not sufficiently reliable to qualify under a recognized exception to the hearsay rule. Similarly, they were not reliable enough to compel admission under *Green* v. *Georgia, supra,* 442 U.S. 95.

Defendant contends the statement and notebook were relevant to show "his mental life, personality, moods, emotions, contrition, and overall psyche," and as rebuttal. Defendant could have presented evidence on these subjects in a proper manner. He could have testified and, if appropriate, refreshed his recollection with the tape or notebook. This would have subjected him to cross-examination, which the defense apparently wanted to avoid. As the trial court suggested, the defense could also have presented expert testimony which could have used these materials as a basis for an expert opinion. (See *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1026-1029 [245 Cal.Rptr. 185, 750 P.2d 1342].) But defendant had no right to effectively have someone else testify for him and thereby prevent cross-examination. (*People* v. *Whitt, supra,* 51 Cal.3d at p. 644; see also *People* v. *Nye* (1969) 71 Cal.2d 356, 372 [78 Cal.Rptr. 467, 455 P.2d 395] ["Objectionable hearsay evidence is no more admissible at the penalty phase than at the guilt phase."].)

Defendant also contends the notebook was a "prose poem," and thus admissible under *People* v. *Harris, supra,* 36 Cal.3d at pages 68-71 (plur. opn. by Broussard, J.). He did not make this claim at trial, and therefore may not do so on appeal. (*People* v. *Kaurish, supra,* 52 Cal.3d at p. 704.) In addition, the notebook did not contain the indicia of reliability that the *Harris* plurality found existed in the poetry of that case. (*Harris, supra,* at pp. 70-71.) The court properly excluded the statement and notebook.

In a related issue, the defense also sought to admit statements defendant allegedly made regarding his experiences while housed in the children's ward of a hospital before the shooting. Counsel argued the testimony was relevant to show defendant's "observations and his concerns about the children and their plight." The court sustained a hearsay objection to the testimony.

Defense counsel conceded the testimony was hearsay, but argued it should have been admitted under *Green* v. *Georgia, supra,* 442 U.S. 95. The alleged

statements were made before the shooting, so the reasons to suspect defendant's motives and sincerity that exist with the taped statement and notebook do not exist. Nevertheless, 10 other witnesses testified about defendant's relationship with children, presenting a picture of a person who cared for and loved them. The witness in question testified in detail about how good defendant was with her children. In light of this, the hearsay statements would have been cumulative, not "highly relevant to a critical issue." (*Id.* at p. 97 [60 L.Ed.2d at p. 741]; see also *People* v. *Kaurish, supra,* 52 Cal.3d at p. 704.) There was no error and no prejudice.

### 4. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecutor committed various acts of misconduct. We disagree.

 He first contends the district attorney violated the rule of *Booth, supra,* 482 U.S. 496, and *Gathers, supra,* 490 U.S. 805, when he argued to the jury, "You can imagine what the experience was like for [Kelly] to go through. You can imagine Vanessa's family and what it's like." The trial court sustained an objection to the reference to Vanessa's family. In any event, as discussed previously, *Booth* and *Gathers* have been overruled in this regard.

Defendant next claims the prosecutor engaged in "speculation regarding inflammatory inferences not supported by the evidence." Based upon the testimony that after the shooting defendant got out of the truck and went to the rear, and Kelly's testimony that she heard something slam, the prosecutor "suggest[ted] to [the jury that defendant] was going to put the girls in the vehicle." The court overruled defendant's objection to the argument, and admonished the jury, "It's up to you, ladies and gentlemen, what you believe to be the facts and what inferences can be drawn." The court was correct. The prosecutor's comment came within the broad range of permissible argument. Whether the inference was reasonable was for the jury to decide. (*People* v. *Kelly, supra,* 51 Cal.3d at p. 967; *People* v. *Warren, supra,* 45 Cal.3d at p. 485, fn. 1.) Contrary to defendant's argument, the prosecutor never implied he had information not available to the jury.

Defendant next claims the prosecutor improperly converted "neutral and mitigating evidence into aggravation." He did not object on this basis at trial, and thus may not raise the issue on appeal. (*People* v. *Bell* (1989) 49 Cal.3d 502, 547 [262 Cal.Rptr. 1, 778 P.2d 129].) In addition, the contention lacks merit. The prosecutor properly argued that defendant's age—37 at the time of the crimes—was aggravating, not mitigating. (*People* v. *Beardslee, supra,* 53 Cal.3d at p. 112.) He also properly argued the *absence* of certain

mitigating evidence, and commented on the mitigating evidence the defense did present. (*People* v. *Caro* (1988) 46 Cal.3d 1035, 1062-1063 [251 Cal.Rptr. 757, 761 P.2d 680].)

Defendant next contends the prosecutor improperly argued, "There is no reason for feeling sympathy. You should try to understand Mr. Edwards; I'm not suggesting that you shouldn't. But not in terms of sympathy." Again, he did not object, so he may not raise the issue on appeal. (*People* v. *Bell, supra,* 49 Cal.3d at p. 547.) In addition, the contention lacks merit. Although a jury is entitled to consider sympathy in its penalty determination—and it would be improper to suggest otherwise (*People* v. *Robertson* (1982) 33 Cal.3d 21, 56-59 [188 Cal.Rptr. 77, 655 P.2d 279])—the jury is not *required* to feel sympathy for murderers. The prosecution may properly argue that the particular facts do not warrant sympathy; the defense may properly argue the opposite.

Defendant finally complains that the prosecutor used the word "execution" in his opening statement to describe the shooting. This appears to be an apt one-word description of the crime. In any event, the court sustained an objection. Since an admonition could have cured any harm, the matter has been waived on appeal. (*People* v. *Carrera, supra,* 49 Cal.3d at pp. 319-320.)

### 5. *Instructional Issues*

#### a. *Instruction During Jury Selection*

During jury selection, the court briefly summarized the process the prospective jurors would be involved in should they be selected for the actual jury. In so doing, the court sometimes referred to mitigating evidence as "good evidence" and aggravating evidence as "bad evidence." Although he did not object at the time, defendant now contends this was an incomplete and hence misleading explanation of mitigating and aggravating factors. Defendant is correct that the terms "good" and "bad" do not thoroughly explain the nature of mitigating and aggravating factors, but he does not demonstrate error.

The purpose of these comments was to give prospective jurors, most of whom had little or no familiarity with courts in general and penalty phase death penalty trials in particular, a general idea of the nature of the proceeding. The comments were not intended to be, and were not, a substitute for full instructions at the end of trial. Indeed, the court informed the jurors that it would instruct them on how to deliberate after the evidence portion of trial.

This court in the past has used the terms "good" and "bad" evidence as shorthand for mitigating and aggravating evidence. (*People* v. *Brown, supra,* 40 Cal.3d at pp. 541-542, fn. 13.) To do the same during jury selection does no harm as long as the jurors are aware—as these were—that the complete instructions which they had to follow would be given at the end of the trial. If defendant wanted the court to give a fuller explanation during jury selection, he should have requested it. (See *People* v. *Medina* (1990) 51 Cal.3d 870, 902 [274 Cal.Rptr. 849, 799 P.2d 1282], and cases cited therein.) He did not do so.

### b. *Instructions on the Deliberative Process*

In *People* v. *Brown, supra,* 40 Cal.3d at page 544, footnote 17, we found that the then-standard jury instructions on the deliberative process were potentially misleading. For the future guidance of the trial courts, we stated that a proposed modification of the standard instruction "would conform to our opinion." (*Id.* at p. 545, fn. 19.) The court in this case instructed the jury in language substantially identical to that approved in *Brown*.[12] Now defendant contends that the *Brown* instruction is incorrect and misleading. We have already rejected such contentions. (*People* v. *Sully, supra,* 53 Cal.3d at pp. 1243-1244; *People* v. *Duncan* (1991) 53 Cal.3d 955, 977-979 [281 Cal.Rptr. 273, 810 P.2d 131]; *People* v. *Cox, supra,* 53 Cal.3d at pp. 679-680.)

### c. *Instruction on Evaluation of Mitigating Factors*

The court gave a "catch-all" mitigation instruction substantially identical to that recommended in *People* v. *Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813]. Defendant contends the court erred in refusing to give an additional instruction.[13] The *Easley* instruction, however, is sufficient to advise the jury of the full range of

---

[12] The court instructed: "The weighing of aggravating and mitigating circumstances does not mean the mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignment of weights to any of them.

"You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various factors, you simply determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances.

"However, to return a judgment of death, each of you must be persuaded that the aggravating evidence is so substantial in comparison with the mitigating circumstances, that it warrants death instead of life in prison without the possibility of parole."

[13] Defendant requested the court also instruct, "In addition to those mitigating circumstances previously provided to you, a mitigating circumstance additionally is that which does

mitigating evidence, and nothing more is required. (*People* v. *Sully, supra,* 53 Cal.3d at pp. 1244-1245; see also *People* v. *Malone* (1988) 47 Cal.3d 1, 54-55 & fn. 30 [252 Cal.Rptr. 525, 762 P.2d 1249] [trial court properly refused the same instruction].) Indeed, the United States Supreme Court has upheld an arguably narrower instruction. (*Boyde* v. *California* (1990) 494 U.S. 370, 377-383 [108 L.Ed.2d 316, 327-331, 110 S.Ct. 1190, 1196-1199].)

 Defendant also contends the court erred in refusing his request to instruct the jury, "If you determine that the aggravating factors substantially outweigh the mitigating factors, you *may* return a finding of death *or* a finding of life in prison without the possibility of parole." (Italics added.) In *Boyde* v. *California, supra,* 494 U.S. at pages 376-377 [108 L.Ed.2d at p. 326, 110 S.Ct. at pp. 1195-1196], the high court upheld an almost diametrically opposite instruction—that the jury "shall impose" the death penalty if it concluded that the aggravating circumstances outweigh the mitigating circumstances. We expressed misgivings about the word "shall" in *People* v. *Brown, supra,* 40 Cal.3d at pages 544-545, and footnote 17, and recommended that future courts instruct as was done in this case. We have never suggested the instruction now urged was required. The *Brown* instruction was sufficient.

### d. *Instruction on Circumstantial Evidence and Reasonable Doubt*

 The court refused defendant's request to instruct that the jury could not draw any inference based on circumstantial evidence unless the underlying facts were proven beyond a reasonable doubt and the inference is the only reasonable one. (See CALJIC No. 2.01.) Defendant contends the court erred.

The contention fails for two reasons. First, the prosecution did not substantially rely on circumstantial evidence for proof of guilt. (*People* v. *Wright* (1990) 52 Cal.3d 367, 406 [276 Cal.Rptr. 731, 802 P.2d 221].) More fundamentally, the reasonable doubt instruction was inappropriate at the penalty phase. At a penalty phase, unlike the guilt phase, the jury does not engage in factfinding as such, but rather determines the appropriate penalty for the crime or crimes of which the defendant has already been convicted. Although other crimes must be proven beyond a reasonable doubt before they can be considered in aggravation (*People* v. *Davenport* (1985) 41 Cal.3d 247, 280-281 [221 Cal.Rptr. 794, 710 P.2d 861]), none was offered in this case. Aggravating factors other than criminal activity need not be proven beyond a reasonable doubt before the jury may consider them.

In *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113], we rejected the claim that a valid death penalty law must

---

not constitute a legal justification or excuse of the offense in question, but which in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability."

require "proof beyond a reasonable doubt of any . . . aggravating factors . . . ." (*Id.* at p. 777.) As we explained, "instructions like those discussed in [*People* v.] *Brown*[, *supra*, 40 Cal.3d 512, and given in this case] are better suited to the normative task of sentencing than are admonitions, such as those urged by appellant, which speak in terms associated with traditional factfinding." (42 Cal.3d at p. 779.)

### e. "Lingering Doubt" Instruction

 Defendant contends the court erred in failing to instruct that the jury could consider a lingering doubt as to premeditation or the lying-in-wait special circumstance in its penalty determination. Although defendant claims otherwise, he did not request such an instruction at trial.[14] The issue is thus whether there is a sua sponte duty to give such an instruction. There is not. (*People* v. *Sully*, *supra*, 53 Cal.3d at p. 1245; *People* v. *Cox*, *supra*, 53 Cal.3d at pp. 675-679.)

### f. Instruction to View Defendant's Admissions With Caution

 Defendant contends the court erred in failing to instruct the jury sua sponte that his admissions should be viewed with caution. As at the guilt phase, Deputy Allen testified at the penalty phase that defendant told him, "Off the record, I'm guilty. I don't know why I shot those two little girls. But I'm guilty as sin. I'm depressed about what I put their families through."

Assuming the instruction applies to the penalty phase (see *People* v. *Morales*, *supra*, 48 Cal.3d at p. 569), its omission could not have prejudiced defendant. "The purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made." (*People* v. *Beagle* (1972) 6 Cal.3d 441, 456 [99 Cal.Rptr. 313, 492 P.2d 1].) Although the inferences to be drawn from defendant's statement were disputed, there was no claim that the statement was not made or was not accurately reported. (*Ibid.*) Indeed, defense counsel, arguing in mitigation, stressed that the precise words defendant used were "an admission of a man with a very tortured soul."

The defense did not dispute that defendant shot the girls. Telling the jury to view his words with caution might have been more damaging to the defense than to the prosecution. ██ ██ There is no reasonable

---

[14]During deliberations, the jury asked for a definition of lying in wait. When the parties and court discussed the appropriate response, the concept of lingering doubt was mentioned, and the defense reiterated its request that the court give the instruction on circumstantial evidence and reasonable doubt. Defendant never requested a lingering-doubt instruction.

possibility that the failure to give the cautionary instruction affected the penalty verdict. (*People* v. *Brown* (1988) 46 Cal.3d 432, 448-449 [250 Cal.Rptr. 604, 758 P.2d 1135].)[15]

g. *Instruction on Age*

 Defendant contends the court should have deleted age as a factor for the jury to consider. We have rejected the contention. (*People* v. *Beardslee, supra,* 53 Cal.3d at p. 112; *People* v. *Lucky* (1988) 45 Cal.3d 259, 301-302 [247 Cal.Rptr. 1, 753 P.2d 1052].) Contrary to defendant's argument, age has not been "manipulated into an all purpose sentencing aggravator." In a given case, the prosecution may argue age is an aggravating factor, and the defense may argue it is mitigating. It is up to the jury to decide. That is the nature of the adversarial process.

h. *Instruction on the Reasons for the Penalty Retrial*

At the beginning of the penalty phase jury selection, defendant asked the court to inform the jury "that there has been a prior trial but that no verdict on death was reached." Defense counsel expressed the concern that, given the length of time between the crime and the trial, the jurors might think that a prior death verdict had been "overturned by the Supreme Court, which I think the court is well aware in today's climate would probably go against my client." The court informed the first jury panel only that defendant previously had been found guilty of murder with the special circumstance of lying in wait, and that the new jury would determine the penalty. The court did tell the second panel that the first jury was unable to reach a penalty verdict. Some, but not all, of the actual jurors heard this latter statement. At the outset of his argument to the jury, defense counsel told the entire jury, without objection, that the first jury had been unable to reach a penalty verdict.

 Defendant argues that at the time of the penalty retrial, the summer of 1986, a confirmation election campaign was underway involving members of this court, and "emotion and rhetoric ran high, focussing attention particularly on this Court's treatment of death penalty appeals." He contends the trial court should have instructed the jury "that the retrial was not the result of a California Supreme Court reversal, and dispel[led] the prejudice and emotion surrounding the proceeding." He understandably does not argue the trial court should have informed the jury of the entire history of the case,

[15]The Attorney General argues that the reasonable probability standard of harmless error should apply. That would be correct as to the guilt phase. (*People* v. *Beagle, supra,* 6 Cal.3d at p. 456.) However, the stricter reasonable possibility standard applies even to errors of state law at the penalty phase. (*People* v. *Brown, supra,* 46 Cal.3d at pp. 448-449.)

including that a second jury *did* return a verdict of death but that the verdict was set aside because of a decision of this court rendered the very day of the verdict. (See *ante,* at p. 804.)

This court has recently twice confronted the reverse contention, that the trial court erroneously told the jury that we had overturned an earlier death verdict in the case. (*People* v. *Anderson* (1990) 52 Cal.3d 453, 466-469 [276 Cal.Rptr. 356, 801 P.2d 1107]; *People* v. *Whitt, supra,* 51 Cal.3d at pp. 639-641.) We found no error in those cases, but have never suggested that the trial court is required to inform the jury of the history of the prior proceedings, and certainly not a partial history. In any event, the court's comments to the second panel and defense counsel's argument effectively informed the jury that the first jury had been unable to reach a penalty verdict. There is no basis even for speculation that the jury's verdict might have resulted from resentment over some presumed reversal by this court.

### i. *Lying-in-wait Instruction*

 The court did not originally instruct the penalty jury on the elements of the special circumstance. During deliberations, the jury asked for the definition of "lying in wait." The court gave the then-standard lying-in-wait instruction, which differed somewhat from the one the court gave at the guilt trial.[16] Defendant objected to both lying-in-wait instructions, but, if either were given, he preferred the one which the court gave.

Defendant reiterates the arguments regarding lying in wait which we have previously rejected. (*Ante,* at pt. II. B. 1. a.) In addition, contrary to his position at trial, he now asserts the new instruction (and the current standard instruction, see CALJIC No. 8.81.15 (5th ed. 1989)) was "[w]orse" than the previous instruction in that the "mens rea only had to be equivalent to 'premeditation *or* deliberation.'" (Italics by defendant.) This was not error. (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 614-615 [244 Cal.Rptr. 200, 749 P.2d 854].)

---

[16]The court instructed, "The term 'while lying in wait' within the meaning of the law of special circumstances is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.

"Thus, for a killing to be perpetrated while lying in wait, both the concealment and watchful waiting as well as the killing must occur during the same time period, or in an uninterrupted attack commencing no later than the moment concealment ends.

"If there is a clear interruption separating the period of lying in wait from the period during which the killing takes place, so that there is neither an immediate killing nor a continuous flow of the uninterrupted lethal events, the special circumstance is not proved." (CALJIC No. 8.81.15 (4th ed. 1983).)

j. *Refusal to Instruct That Absence of a Mitigating Factor Is Not Necessarily an Aggravating Factor*

■ The court refused defendant's request to instruct the jury, "The absence of a statutory mitigating factor does not necessarily constitute an aggravating factor." Defendant contends this was error. However, use of the word "necessarily" would itself have been potentially misleading. (*People* v. *Melton* (1988) 44 Cal.3d 713, 769 [244 Cal.Rptr. 867, 750 P.2d 741].) In addition, the instruction had little relevance to this case. At defense request, the court deleted from the instructions the assertedly inapplicable mitigating factors (unnecessarily, see *People* v. *Malone, supra,* 47 Cal.3d at p. 47). Although the prosecutor properly discussed the absence of certain mitigating evidence, and argued that age was an aggravating factor, no one suggested the mere absence of mitigating factors was itself aggravating. There was no error.

k. *Other Instructions*

Defendant raises other instructional issues involving reasonable doubt and the burden of proof that we have repeatedly rejected. (E.g., *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779.) We adhere to our prior decisions.

6. *Accumulated Error*

Defendant contends the cumulative effect of the alleged errors requires reversal of the penalty verdict. There was, however, little error to accumulate. After reviewing the record, we find no reasonable possibility any error affected the penalty verdict. (*People* v. *Brown, supra,* 46 Cal.3d at pp. 448-449.)

7. *Automatic Motion to Modify Death Verdict*

■ Defendant contends the trial court erred in denying his automatic motion to modify the verdict under section 190.4, subdivision (e). ■ The court must independently reweigh the evidence of aggravating and mitigating circumstances and then determine whether, in the court's independent judgment, the weight of the evidence supports the jury verdict. It must set forth its reasons with sufficient particularity to allow effective appellate review. (*People* v. *Kelly, supra,* 51 Cal.3d at p. 970.) The record reveals the court understood and fully executed its responsibilities.

■ At defense request, the court followed an unusual procedure in this case. It allowed the defense to present a substantial amount of new

expert testimony. Thereafter, it denied the section 190.4 motion, expressly considering only the evidence presented to the jury. Defendant then moved under sections 1181 and 1385 to reduce the sentence in light of the new evidence. The court expressed doubt that it had authority to consider such a motion, but assumed it did and denied the motion. It found the additional expert testimony not very helpful to the defense. Defendant challenges these rulings on a host of grounds.

Defendant first contends the court did not fully consider the mitigating evidence. He pulls from context a statement that the mitigating factors "do not extenuate the gravity of the crime," points out that the court used the statutory word "extreme" in discussing one of the statutory factors, and claims the court did not recognize the full range of mitigating evidence it had to consider. We rejected a similar claim in *People* v. *Siripongs* (1988) 45 Cal.3d 548, 585 [247 Cal.Rptr. 729, 754 P.2d 1306]. As noted above (*ante*, at pt. II. C. 5. c.), the court correctly gave the "catch-all" instruction on mitigating evidence recommended in *People* v. *Easley, supra,* 34 Cal.3d at page 878, footnote 10. The court's discussion as a whole showed an awareness it had to independently reweigh *all* the evidence, including the mitigating evidence. (See *Siripongs, supra,* 45 Cal.3d at p. 585.) The court did not fail to consider any mitigating evidence; rather, it found that the "aggravating circumstances far outweigh . . . the mitigating circumstances."

Defendant next contends the court improperly treated the absence of a mitigating factor as an aggravating factor. The record does not support the claim. Indeed, the court expressly stated that the prosecution had offered no aggravating evidence other than the facts of the crime. It merely commented on the absence of certain mitigating factors, which was proper. (*People* v. *Siripongs, supra,* 45 Cal.3d at p. 585.)

Defendant also contends the court improperly considered the probation report in its modification ruling. (See *People* v. *Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892].) On the contrary, the court stated that, for purposes of the section 190.4 motion, it had "disregarded any evidence other than that which was presented to the jury at the penalty hearing . . . ."

Defendant also argues that the court improperly *refused* to consider the new evidence he presented at the modification hearing. The modification hearing is, however, limited to consideration of the evidence presented to the jury. (*People* v. *Marshall* (1990) 50 Cal.3d 907, 942 [269 Cal.Rptr. 269, 790 P.2d 676].) In any event, after it denied the automatic motion to modify, the court assumed defendant had the right to present new evidence, and denied a new motion to modify based upon that evidence.

Defendant disputes some of the factual points the court made in the course of these rulings. Our review of the record shows the court was generally accurate. Any misstatements were minor; there is no reasonable possibility they affected the rulings. (*People* v. *Benson, supra,* 52 Cal.3d at p. 812.)

Defendant finally contends the denial of the motion to modify was inconsistent with earlier actions of the court. Before the third trial, the court wrote that it "believes that an appropriate disposition of the Edwards case would be to impose a sentence of life in prison without the possibility of parole, with defendant waiving his right to appeal." The stated reason was that an appellate court might find that for the lying-in-wait special circumstance, there must be physical concealment of presence, which was not present in this case. Thus the court suggested a compromise, which was not accepted. It is now settled that there need not be physical concealment of presence.

Defendant argues that once the court suggested the compromise settlement, due process and the Eighth Amendment prohibit a death verdict. We disagree. The court believed the case raised a difficult legal question that might result in reversal and a possible fourth trial. It never found the death penalty factually inappropriate. An offer to dispose of a case by a negotiated plea does not preclude an ultimate sentence more severe than that offered, including death. (*Bundy* v. *Dugger* (11th Cir. 1988) 850 F.2d 1402, 1423 [offer of a life sentence before trial does not preclude ultimate imposition of the death penalty]; *People* v. *Szeto* (1981) 29 Cal.3d 20, 35 [171 Cal.Rptr. 652, 623 P.2d 213] [more severe sentence after trial than offered before trial in noncapital case upheld].)

As in *Francis* v. *Dugger* (S.D.Fla. 1988) 697 F.Supp. 472, 479, affirmed (11th Cir. 1990) 908 F.2d 696, 705-706, certiorari denied (1991) __ U.S. __ [114 L.Ed.2d 90, 111 S.Ct. 1696], "the trial judge imposed the death penalty after fully considering the aggravating and mitigating circumstances and the jury's recommendation, and he set forth in a clear fashion his reasons for the death sentence." There was no error.

8. *Propriety of the Death Sentence*

Defendant reiterates constitutional challenges to the 1978 death penalty law which we have long since rejected, and which we continue to reject. (E.g., *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779.)

 He also contends that as applied to him the death sentence is "arbitrary, discriminatory and disproportionate." We disagree. Defendant

carefully selected as his victims two 12-year-old girls, who were of no possible threat to him, and who should have had their entire lives ahead of them. He shot one victim between the eyes, killing her, and shot the second in the head, fortunately only wounding her. The evidence supports the trial court's assessment that the crime was an "intended execution and the defendant did not intend to leave any survivors. [¶] The lying in wait in this case was a procedure that the defendant intentionally used to accomplish bringing the two girls into such close range unsuspecting and without warning so that he could hardly miss. Neither one, neither girl would have time to run, to duck, or to scream even." Under these facts, the death sentence is not " ' "so disproportionate to the crime . . . that it shocks the conscience and offends fundamental notions of human dignity." ' " (*People* v. *Cox, supra*, 53 Cal.3d at p. 690, quoting *People* v. *Frierson* (1979) 25 Cal.3d 142, 183 [158 Cal.Rptr. 281, 599 P.2d 587] (plur. opn. by Richardson, J.), italics omitted.)

### III. CONCLUSION

The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Baxter, J., and George, J., concurred.

**KENNARD, J.,** Concurring.—I concur in the affirmance of the judgment imposing the death penalty, but I am unable to join that portion of the majority opinion discussing the admissibility of victim impact evidence. I agree that the evidence at issue in this case—photographs of the victims— was properly admitted at the penalty phase. But I see no justification for the majority opinion's expansive dicta about the admissibility of victim impact evidence in general.

Under our state law, Penal Code section 190.3 governs the scope of permissible evidence and argument at the penalty phase of a capital prosecution. Factor (a) of that section permits evidence and argument about the "circumstances of the crime." Whatever the outer boundaries of that concept may be, the "circumstances of the crime" must include the events that make up the crime itself and facts about the victim known to the defendant at the time of the crime.

In this case, the evidence showed that defendant saw the victims before he shot them. Because the victims' physical appearance was a fact about the victims known to defendant when he committed the crimes, it was one of the "circumstances of the crime" as that phrase is used in factor (a) of Penal Code section 190.3. The photographs in question were offered to show, and did show, the physical appearance of the two victims at the time of the

crimes. Because the photographs showed what defendant saw while he committed the crimes, they were admissible to demonstrate the "circumstances of the crime."

The prosecution's use of this evidence is in no way contrary to the Eighth Amendment to the federal Constitution. The United States Supreme Court has always held that the Eighth Amendment permits, and indeed requires, that the sentencing decision in a capital case be based at least in part on the "circumstances of the crime" (see *Zant* v. *Stephens* (1983) 462 U.S. 862, 879 [77 L.Ed.2d 235, 251, 103 S.Ct. 2733]) and it has recently held as well that the Eighth Amendment erects no per se bar, at the sentencing phase of a capital case, to evidence and argument about the victims' individual characteristics. (*Payne* v. *Tennessee* (1991) 501 U.S. __, __ [115 L.Ed.2d 720, 736, 111 S.Ct. 2597, 2609].)

The majority purports to hold that "factor (a) of section 190.3 allows evidence and argument on the specific harm caused by the defendant, including the impact on the family of the victim." (Maj. opn., *ante*, p. 835.) There can be no such holding in this case because " 'the language of an opinion must be construed with reference to the facts presented by the case, and the positive authority of a decision is coextensive only with such facts.' " (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 734-735 [257 Cal.Rptr. 708, 771 P.2d 406], quoting *River Farms Co.* v. *Superior Court* (1933) 131 Cal.App. 365, 369 [21 P.2d 643].) This appeal presents no issue about the propriety of evidence or argument on the impact of a capital crime on the victim's family, or the propriety of evidence or argument offered only to show the "specific harm caused by the defendant," and so there can be no holding on those issues. Their resolution must await a case that actually presents them.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment as to guilt. After review, I have found no error warranting reversal.

I dissent from the judgment as to penalty. For the reasons stated in my concurring and dissenting opinion in *People* v. *Morales* (1989) 48 Cal.3d 527, 574-575 [257 Cal.Rptr. 64, 770 P.2d 244], I believe that the lying-in-wait special circumstance of the 1978 death penalty law is invalid under the Eighth Amendment to the United States Constitution. Lying in wait was the only special circumstance alleged and found true in this case. Because it should be vacated on federal constitutional grounds, the verdict of death should be set aside as unsupported.

Although I need not consider any other issue bearing on penalty in this particular case, I write further to address a question of general and substan-

tial importance to the jurisprudence of capital punishment in California: Does the 1978 death penalty law allow the introduction of so-called "victim impact" evidence?

I shall begin, where I must, with the language of the 1978 death penalty law. Its background is this.

In 1977, the Legislature enacted Senate Bill No. 155, 1977-1978 Regular Session. (Stats. 1977, ch. 316, § 1 et seq., p. 1255 et seq.) This statute, among other things, repealed Penal Code section 190 et seq. as those provisions then stood, and added new provisions in their place. This was the 1977 death penalty law.

At the November 7, 1978, General Election, the people enacted a statute when they approved an initiative denominated on the ballot as Proposition 7. This statute, in its turn, repealed Penal Code section 190 et seq. as those provisions stood under Senate Bill No. 155, and added new provisions in their place. This is the 1978 death penalty law.

Now to the relevant statutory language. Penal Code section 190.3 declares in pertinent part that "In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence including, but not limited to, the nature and circumstances of the present offense, any prior felony conviction or convictions whether or not such conviction or convictions involved a crime of violence, the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence, and the defendant's character, background, history, mental condition and physical condition."[1]

This language of Penal Code section 190.3 under the 1978 death penalty law evidently derives directly from former Penal Code section 190.3 under the 1977 death penalty law. It is virtually identical to its predecessor except for added words dealing with prior felony convictions. (Compare Pen. Code, § 190.3 with Pen. Code, former § 190.3, Stats. 1977, ch. 316, § 11, pp. 1258-1259.)[2]

---

[1]Penal Code section 190.3 restates the substance of the language quoted above in its list of penalty factors.

[2]Similarly, the language of Penal Code section 190.3 under the 1978 death penalty law that is referred to in footnote 1, *ante*, derives directly from former Penal Code section 190.3 under the 1977 death penalty law. It too is virtually identical to its predecessor except for added

In *People* v. *Boyd* (1985) 38 Cal.3d 762, 772-776 [215 Cal.Rptr. 1, 700 P.2d 782], we construed the 1978 death penalty law to allow the introduction of only such evidence as is relevant to one or more of the following issues: (a) the circumstances of the crime; (b) other violent criminal activity; (c) prior felony convictions; (d) extreme mental or emotional disturbance; (e) victim participation or consent; (f) reasonable belief in moral justification or extenuation; (g) extreme duress or substantial domination; (h) impairment through mental disease or defect or through intoxication; (i) age; (j) status as an accomplice and minor participant; and (k) any other mitigating matter.

I return to the question whether the 1978 death penalty law allows the introduction of "victim impact" evidence. At the outset, it is necessary to define the scope of the evidence and the coverage of the law.

First, the scope of "victim impact" evidence. In its broadest definition, evidence of this sort appears to embrace four matters: (1) the effect of the crime on the victim; (2) the victim's personal characteristics; (3) the emotional impact of the crime on the victim's family (and perhaps others); and (4) the opinions about the crime and the criminal held by family members (and perhaps others). (See generally *Payne* v. *Tennessee* (1991) 501 U.S. __, __-__ [115 L.Ed.2d 720, 726-739, 111 S.Ct. 2597, 2601-2611], overruling in part *Booth* v. *Maryland* (1987) 482 U.S. 496, 502-509 [96 L.Ed.2d 440, 448-452, 107 S.Ct. 2529], and *South Carolina* v. *Gathers* (1989) 490 U.S. 805, 810-812 [104 L.Ed.2d 876, 882-883, 109 S.Ct. 2207] [each of the three decisions referring wholly or mainly to the second, third and fourth matters]; *People* v. *Benson* (1990) 52 Cal.3d 754, 796-797 [276 Cal.Rptr. 827, 802 P.2d 330] [referring to all four matters]; *People* v. *Haskett* (1982) 30 Cal.3d 841, 863-864 [180 Cal.Rptr. 640, 640 P.2d 776] [referring to the first matter].)

Next, the coverage of the 1978 death penalty law. The only issue as to which "victim impact" evidence may possibly be relevant is, of course, the circumstances of the crime. But to what does this phrase refer? The answer cannot come from an abstract consideration of the dictionary definitions of the individual words.[3] Rather, it entails an inquiry into the intent of the people when they enacted the present statute by approving Proposition

---

words dealing with prior felony convictions. (Compare Pen. Code, § 190.3 with Pen. Code, former § 190.3, Stats. 1977, ch. 316, § 11, pp. 1259-1260.)

[3]And certainly not, as the majority evidently believe (see maj. opn., *ante*, at p. 833), from the historically most primitive sense (1 Oxford English Dict. (2d ed. 1989) pp. xxviii-xxix) of the single word "circumstance" (3 Oxford English Dict., *supra*, at p. 240) as reported in the Oxford English Dictionary. Why is it that the majority turn to the Oxford English Dictionary—which is cited rarely in our opinions—instead of Webster's Third New International Dictionary—which is referred to commonly? The reader will soon discover the answer if only

7—and ultimately into the intent of the Legislature when it enacted Senate Bill No. 155, the direct source of the operative language.

To give its clear words their plain meaning, the phrase "circumstances of the crime" evidently refers to such facts as are "part" of the crime itself— including, for example, the manner in which the actus reus was performed and the motive that underlay the mens rea. Put differently, it relates, as it were, to what journalism would call the "who, what, where, when, and why" of the offense.

The same meaning arises from the relevant legal context.

In *Gregg* v. *Georgia* (1976) 428 U.S. 153, 189 [49 L.Ed.2d 859, 883, 96 S.Ct. 2909], one of the United States Supreme Court's landmark capital punishment decisions, the plurality opinion of Justices Stewart, Powell, and Stevens quoted from the opinion of the court in *Pennsylvania* v. *Ashe* (1937) 302 U.S. 51, 55 [82 L.Ed. 43, 46, 58 S.Ct. 59], to declare that " '[f]or the determination of sentences, justice generally requires . . . that there be taken into account *the circumstances of the offense* together with the character and propensities of the offender.' " (Italics added.) The italicized phrase is not expressly defined. Its meaning, however, is suggested by the case law from which *Ashe* evidently drew the words: it refers—unsurprisingly—to such facts as are part of the crime itself. (Note (1990) 56 Brooklyn L.Rev. 1045, 1073-1076.)

It is reasonable to conclude that such a definition was intended by the Legislature in enacting Senate Bill No. 155. *Gregg* stood immediately behind the statute and informed its substance. (See *People* v. *Frierson* (1979) 25 Cal.3d 142, 172-184 [158 Cal.Rptr. 281, 599 P.2d 587] (plur. opn.); see also *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420, 426-445 [134 Cal.Rptr. 650, 556 P.2d 1101].) It is also reasonable to conclude that the same definition was intended by the people in enacting the present statute through their approval of Proposition 7. *Gregg* was present and influential there as well. (See *People* v. *Frierson, supra,* at pp. 172-184 (plur. opn.); see also *Rockwell* v. *Superior Court, supra,* at pp. 426-445.) Further, the pertinent language of the initiative derives directly from the statute.

In view of the foregoing, the circumstances of the crime under the 1978 death penalty law should be deemed to include such facts as are part of the crime itself.

It is sometimes argued that the phrase in question can be read, in the abstract, to reach "victim impact" evidence in its broadest definition. But I cannot conclude that the people intended such coverage.

---

he or she notes that the first sense of "circumstance" as reported in Webster's Third New International Dictionary is "a specific *part* . . . of the surroundings or background of an event . . . ." (Webster's New Internat. Dict. (3d ed. 1961) p. 410, italics added.)

To be sure, in 1978 the effect of the crime on the victim himself appears to have been firmly accepted as a factor bearing on penalty. (See, e.g., Cal. Rules of Court, former Div. I-A, Sentencing Rules for the Superior Courts, adopted eff. July 1, 1977, now Div. III, renumbered eff. Jan. 1, 1984 (hereafter Cal. Rules of Court), former rule 421(a)(1) ["Circumstances in aggravation include" "[f]acts relating to the crime, including the fact that" "[t]he crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness or callousness . . . ."].)

But by 1978, the victim's personal characteristics, the emotional impact of the crime on the victim's family and others, and the opinions about the crime and the criminal held by such persons had not yet received acceptance as penalty factors. (See, e.g., Cal. Rules of Court, *supra*, former rule 421 [not including such matters among the defined "[c]ircumstances in aggravation" either expressly or impliedly].) Indeed, they began to receive some recognition only in the early 1980's. (Hudson, *The Crime Victim and the Criminal Justice System: Time for A Change* (1984) 11 Pepperdine L.Rev.—Symposium—23, 51-53; see *Payne* v. *Tennessee, supra*, 501 U.S. at p. __ [115 L.Ed.2d at p. 533, 111 S.Ct. at p. 2606] [stating that "the admission of this particular kind of evidence . . . is of recent origin"].)

Significant in this regard is the leading case of *People* v. *Bernette* (1964) 30 Ill.2d 359 [197 N.E.2d. 436]. There, the Illinois Supreme Court reversed a judgment of death because of the erroneous introduction of what is now called "victim impact" evidence. In so doing, it declared: "[T]his court has consistently condemned the admission of evidence that the deceased left a spouse and a family, inasmuch as such evidence has no relationship to . . . the punishment to be inflicted upon [the defendant], but serves ordinarily only to prejudice him in the eyes of the jury." (*Id.* at p. 371 [197 N.Ed.2d at p. 443].)

Therefore, in its broadest definition "victim impact" evidence was novel when the people considered Proposition 7. There is no basis to conclude that evidence of this sort was within contemplation. There is less basis still to conclude that it would have been permitted. Clearly, those who drafted the initiative desired to assure its constitutionality. (See Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1978), rebuttal to argument against Prop. 7, p. 35.) Presumably, those who voted for the measure shared that desire. If constitutionality was the end, novelty was not the means. In his briefing on the People's behalf in this appeal, the Attorney General effectively concedes the point: "California law does not allow the full measure of victim impact information . . . ."

Now I address the question whether the 1978 death penalty law allows the introduction of "victim impact" evidence. The circumstances of the crime constitute the only issue as to which evidence of this sort may possibly be relevant. They include such facts as are part of the crime itself. Plainly, they embrace the effect of the crime on the victim himself. He is the very focus of the defendant's act and intent. Just as plainly, they generally do not reach the victim's personal characteristics, the emotional impact of the crime on the victim's family and others, and the opinions about the crime and the criminal held by such persons. Typically, these facts are not part of the crime.

The majority conclude that the circumstances of the crime under the 1978 death penalty law embrace "the specific harm caused by the defendant, including the impact on the family of the victim." (Maj. opn., *ante*, at p. 835.) To the extent they hold that the effect of the crime on the victim himself is material, I agree. Otherwise, I do not. My analysis has shown that the emotional impact of the crime on the victim's family is generally immaterial.

Indeed, just a year ago in *People v. Gordon* (1990) 50 Cal.3d 1223, 1266-1267 [270 Cal.Rptr. 451, 792 P.2d 251], we concluded *unanimously* that "the only circumstances material to the determination of penalty [under the 1978 death penalty law] are those defined in Penal Code section 190.3 . . . . In the general case . . . the effect of the crime on the victim's family is not relevant to any material circumstance."

The majority now assert that what they call *Gordon*'s "assumption" "is suspect in light of" *People v. Haskett, supra*, 30 Cal.3d 841, 863-864, *People v. Douglas* (1990) 50 Cal.3d 468, 536-537 [268 Cal.Rptr. 126, 788 P.2d 640], and *People v. Benson, supra*, 52 Cal.3d 754, 796-797, and "was largely based on *Booth* and *Gathers*." (Maj. opn., *ante*, at p. 835.) They are wrong. First, *Haskett* holds only that the circumstances of the crime under the 1977 death penalty law embraces the effect of the crime on the victim himself; *Douglas* and *Benson* do not even address a statutory issue. Second, in part pertinent here *Gordon* was based solely on the 1978 death penalty law and, specifically, Penal Code section 190.3—and not at all on *Booth* or *Gathers*. The opinion speaks for itself.

With the foregoing in mind, let me briefly consider the "victim impact" issues raised in this case.

First, the admission of the photographs of the victims before the attack— Kelly Cartier, who survived, and Vanessa Iberri, who did not. There was no error. The evidence was relevant to the circumstances of the crime. It bore on

facts that were part of the crime itself: it revealed the crime's effect on the girls by revealing the girls themselves.

Second, the prosecutor's summation, which touched on the effect of the crime on Kelly and on Vanessa's family. Of course, one cannot present argument on issues that are not material. The comment about Kelly was not misconduct. It related to the circumstances of the crime because it bore on facts that were part of the crime itself, specifically, the crime's effect on the girl. By contrast, the comment about Vanessa's family was misconduct. It did not relate to the circumstances of the crime. Neither did it refer to any other material issue. Reversal, however, is not warranted on this basis. The comment was brief and neutral. At defendant's request, the trial court struck the remark and admonished the jury not to consider it in any way. There is no reasonable possibility that the words in question affected the outcome. (*People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

For the reasons stated above, I am of the view that the judgment should be affirmed as to guilt and reversed as to penalty.

Appellant's petition for a rehearing was denied January 22, 1992. Mosk, J. was of the opinion that the petition should be granted.